J-A01003-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| HORACE DAVIS, ADMINISTRATOR OF THE ESTATE OF GRACE KELLY DAVIS, DECEASED, | : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : : : : | |
| 2507 CHESTNUT STREET OPERATIONS, LLC D/B/A/ THE BELVEDERE CENTER, GENESIS HEALTHCARE, LLC, DELAWARE COUNTY MEMORIAL HOSPITAL, CROZER-CHESTER MEDICAL CENTER, CROZER-KEYSTONE HEALTH SYSTEM, KINDRED HOSPITAL PHILADELPHIA-HAVERTOWN, KINDRED HOSPITAL EAST, LLC, KINDRED HEALTHCARE, INC., MERCY CATHOLIC MEDICAL CENTER OF SOUTHEASTERN PENNSYLVANIA D/B/A MERCY FITZGERALD HOSPITAL AND MERCY HEALTH SYSTEM OF SOUTHEASTERN PENNSYLVANIA | : : : : : : : : : : : : : : : : : : | No. 1048 EDA 2018 |

Appeal from the Order Entered March 27, 2018
In the Court of Common Pleas of Delaware County
Civil Division at No(s): 2017-001749

BEFORE: OTT, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY OTT, J.:                    **FILED SEPTEMBER 16, 2019**

Kindred Hospital Philadelphia-Havertown, Kindred Hospital East, LLC,

and Kindred Healthcare, Inc. (collectively, "Kindred")[1] appeal from the order

_____

[1] The remaining entities listed in this appeal with Kindred are not a party to
this appeal.

of the Delaware County Court of Common Pleas, dated March 27, 2018, overruling their preliminary objections to the complaint filed by Horace Davis, Administrator of the Estate of Grace Kelly Davis, deceased, ("Davis")[2] in this medical professional liability action. Kindred raises the following three arguments: (1) whether the trial court erred in refusing to enforce the Alternative Dispute Resolution ("ADR") Agreement signed by Decedent, where Davis failed to meet his burden to demonstrate by clear and convincing evidence that Decedent lacked the capacity to understand the agreement; (2) whether the court erred in refusing to enforce two ADR Agreements signed by Davis despite evidence of long-standing and continuously granted authority conferred upon him by Decedent; and (3) whether the court erred and/or abused its discretion by refusing to enforce the ADR Agreement on the grounds of unconscionability, even though the terms of the agreement were verbally explained and understood by Davis. Based on the following, we affirm.

The trial court set forth the following underlying facts as follows:

> [Decedent] entered Kindred Hospital Philadelphia-Havertown, owned and operated by Defendants, Kindred Hospital East, LLC and Kindred Healthcare, Inc., on April 2, 2015 and remained in the facility through April 20, 2015. Upon admission,

---

[2] Horace Davis and Grace Kelly Davis were husband and wife. They were will be referred to Davis and Decedent, respectively. Davis is a retired non-attorney magisterial district judge. **See** Defendants' Supplemental Memorandum of Law in Support of Defendants' Preliminary Objection to Enforce the Alternative Dispute Resolution Agreement, 10/25/2017, Exhibit C, Deposition of Horace Davis (8/31/2017), at 9.

she presented with pressure ulcers which persisted and deteriorated during her stay at [Kindred's] facility. [Decedent] was again admitted to Kindred Hospital Philadelphia-Havertown on June 19, 2015; this admission lasted until July 9, 2015 during which time her same wounds persisted and deteriorated. [Decedent] was last admitted to Kindred Hospital Philadelphia-Havertown on July 30, 2015; this admission lasted until August 25, 2015 during which time her same wounds persisted and deteriorated further to a stage of IV. Throughout [Decedent]'s stay at [Kindred's] facility, she allegedly received inadequate care and treatment. [Decedent] died on November 20, 2015 and [Davis] alleges that the pressure ulcers, which were caused solely and exclusively by the conduct of [Kindred] (and/or their respective agents, servants, employees) caused and/or contributed to her demise.

Trial Court Opinion, 7/2/2018, at 2 (record citations omitted).

During Decedent's stay at the hospital, she and Davis executed several Voluntary Arbitration Agreements, which were identical and contained the same terms. "The Agreements were allegedly executed on or about March 13, 2015 by [Davis], on or about June 19, 2015 by decedent, Mrs. Davis, and on or about July 31, 2015 by [Davis] at the time of three separate admissions of [Decedent] to [Kindred's] facility." *Id.* at 2 (footnote omitted). An example of the Agreement is as follows, in relevant part:

VOLUNTARY ALTERNATIVE DISPUTE RESOLUTION AGREEMENT
BETWEEN PATIENT AND HOSPITAL

Under both federal and state law two or more parties may agree in writing for the settlement by arbitration of any dispute arising between them. The following is an agreement to resolve any and all disputes that might arise between the Patient and the Hospital through alternative dispute resolution methods, including mediation and arbitration.

I. This Alternative Dispute Resolution Agreement ("Agreement") is made and entered into this 19 day of June, 2015, by and

between Kindred Hosp. Havertown ("Hospital") and DAVIS, GRACE ("Patient") (collectively, the "Parties"). The term "Patient" includes the Patient, his/her Guardian or Attorney in Fact, agent, or any person acting as the Patient's Legal Representative whose claim is derived through or on behalf of the Patient.

II. Alternative dispute resolution, including mediation and arbitration, is a fair, cost-effective method to quickly resolve disputes, which may arise as a result of the Patient's hospitalization, without the substantial time and expense of using the courts. Mediations and arbitration hearings take only weeks or months to schedule, while civil litigation generally takes years to complete. By avoiding the court system, Patient and Hospital avoid significant costs. There are charges and fees involved in mediation and arbitration, but mediations and arbitration hearings will almost always resolve a dispute sooner and at less cost than a trial.

III. It is important to understand, that both the Patient and the Hospital will have only a limited right to appeal an arbitration award. Unless there is evidence of fraud on the part of the arbitrator(s) or a serious procedural defect, an arbitration award will be final. Both the Hospital and the Patient will be bound by the decision of the arbitrator(s).

IV. This Agreement is optional. The Hospital will provide needed services to you even if you do not sign the Agreement.

V. By signing this Agreement, you give up your Constitutional right to a trial by a jury or a judge, and you agree that any dispute between you and the Hospital will be subject to mediation and binding arbitration. Likewise, by signing this Agreement the Hospital gives up its right to a trial by a jury or a judge, and agrees that any dispute with you will be subject to mediation and binding arbitration.

…

B. Scope of ADR. Any and all claims disputes arising out of or in any way relating to this Agreement, including disputes regarding the validity or scope of the Agreement or the interpretation of the Agreement, and any and all disputes relating to the Patient's stay at the Hospital, whether arising out of State or Federal law, whether existing or arising in the future, whether for statutory,

compensatory or punitive damages, and whether sounding in breach of contract, tort or breach of statutory duties (including, without limitation, any claim based on violation of rights, negligence, medical malpractice, any other departure from the accepted standards of health care or safety or unpaid charges), irrespective of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to ADR, as described in the DJS Rules of Procedure, and resolved by binding arbitration. This Agreement includes claims against the Hospital, its employees, agents, officers, directors, any parent company, subsidiary or affiliate of the Hospital and/or its Medical Director(s) in his capacity as Medical Director. Only disputes that would constitute legally cognizable cause of action in a court of law may be submitted to the ADR process. All claims based in whole or in part on the same incident(s), transaction(s), or related course of care or services provided by Hospital to the Patient, shall be submitted and mediated or arbitrated in one proceeding or the claim shall be waived.

Preliminary Objections of Kindred to Plaintiff's Complaint, 3/21/2017, at

Exhibit B.

On March 3, 2017, Davis instituted this medical negligence action

against Kindred and several other defendants. Subsequently,

[o]n March 22, 2017, [Kindred] filed Preliminary Objections to [Davis'] Complaint seeking to compel arbitration of [Davis'] claims under the Agreements that had been executed by [Davis] and [Decedent]. On April 11, 2017, [Davis] responded to [Kindred's] Preliminary Objections asserting that the Agreements are unenforceable as [Decedent] lacked the mental capacity to enter into the Agreement she executed, that [Davis] lacked the authority to bind [Decedent] to the Agreements he executed, that the Agreements are unconscionable contracts of adhesion, and that enforcing the Agreements would deny the wrongful death beneficiaries their constitutional right to a jury trial. [Kindred] filed a Supplemental Memorandum of Law on April 25, 2017 in response to [Davis'] Answer and asserted that [Davis] failed to meet the burden of showing that [Decedent] was "incompetent" to enter into the Agreement that she signed, that [Davis] had apparent authority and/or agency by estoppel was established to execute the Agreements he signed, that the Agreements are not

unconscionable as the Pennsylvania Superior Court did not find unconscionable an agreement to arbitrate that was similar in all material respects to the Agreements at issue, and that the facts averred in [Davis'] Complaint do not support a wrongful death claim. Further, [Kindred] requested discovery in the form of a deposition of [Davis] and request for production of documents.

On July 13, 2017, this Court entered an Order granting additional time for the parties to conduct discovery and supplement the record as deemed necessary on issues relating to the validity and/or enforceability of the Agreements. On October 25, 2017, upon completion of the additional discovery permitted by the Court, which included the depositions of [Kindred's] Admissions Coordinator and [Davis], [Kindred] filed a Supplemental Memorandum of Law in support of their position to enforce the Agreements. On October 26, 2017, [Davis] filed a Supplemental Memorandum of Law in support of his position. On March 27, 2018, this Court entered an Order overruling [Kindred's] Preliminary Objections to [Davis's] Complaint from which [Kindred] took their appeal on April 4, 2018.

Trial Court Opinion, 7/2/2018, at 3-4 (citations omitted). Specifically, the court found:

[Kindred's] Preliminary Objections were properly overruled as [Decedent] did not have the requisite mental capacity to enter the Agreement, [Davis] did not have authority to enter the Agreements and the Agreements are unconscionable. As such, the Agreements requiring the parties to proceed to arbitration are each unenforceable as a whole and this action should remain before this Court.

*Id.* at 4. This appeal followed.[3]

_____

[3] We note:

"As a general rule, an order denying a party's preliminary objections is interlocutory and, thus, not appealable as of right. There exists, however, a narrow exception to this oft-stated rule for cases in which the appeal is taken from an order denying a

- 6 -

We begin with the following: "Our standard of review of an order of the trial court overruling [or granting] preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court." *DeLage Landen Fin. Servs., Inc. v. Urban P'ship, LLC*, 903 A.2d 586, 589 (Pa. Super. 2006) (citation omitted). "When preliminary objections, if sustained, would result in the dismissal of an action, such objections should be sustained only in cases which are clear and free from doubt." *Id.* (citations omitted).

Moreover, our review "is limited to determining whether the trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying [the objections]." *Gaffer Ins. Co., Ltd. v. Discover Reinsurance Co.*, 936 A.2d 1109, 1112 (Pa. Super. 2007) (citation omitted).

---

petition to compel arbitration." *Shadduck v. Christopher J. Kaclik, Inc.*, 713 A.2d 635, 636 (Pa. Super. 1998) (citations omitted). *See also* 42 Pa.C.S. § 7320(a)(1) (stating appeal may be taken from court order denying application to compel arbitration); Pa.R.A.P. 311(a)(8) (stating appeal may be taken as of right and without reference to Pa.R.A.P. 341(c) from order "which is made appealable by statute or general rule.").

*Elwyn v. DeLuca*, 48 A.3d 457, 460 (Pa. Super. 2012). *See* Preliminary Objection of Kindred to Plaintiff's Complaint, 3/21/2017, at 3-5 (arguing that pursuant to the arbitration agreement, Davis' claims should be submitted to arbitration).

In its first issue, Kindred claims Davis did not establish by clear and convincing evidence that Decedent was incapacitated which prevented her from knowingly entering into the June, 19, 2015, arbitration agreement. Kindred's Brief at 16. Relying on *Cardinal v. Kindred Healthcare, Inc.*, 155 A.3d 46 (Pa. Super. 2017), *appeal denied*, 170 A.3d 1063 (Pa. 2017), Kindred states:

> The fatal flaw in the trial court's reasoning stems from its failure to apply the accepted rule that [Decedent's] signature on the Agreement creates a presumption that the Agreement is valid, thereby shifting the burden to her to demonstrate, by clear and convincing evidence, that the signature was not validly obtained.

*Id.*

Moreover, Kindred alleges:

> There is no dispute that both [Decedent] and the [Kindred] representative actually signed this particular Agreement. [Davis] now claims that [Decedent] did not understand what [she] was signing due to mental incapacity. [Davis'] defense is the exact type of affirmative incapacity defense where the burden shifts to h[im] to demonstrate that the Agreement is void for some reason outside the parameters of the document. *See*, *e.g.*, *Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 129 (Pa. 2007) (party challenging the agreement bears the burden of proof); *MacPherson v. Magee Mem'l Hosp. for Convalescence*, 128 A.3d 1209, 1221 (Pa. Super. 2015) (*en banc*) (party asserting arbitration agreement is void due to procedural and substantive unconscionability has the burden of proof).
>
> Applying the correct evidentiary burdens, the trial court clearly erred in finding that clear and convincing evidence showed that [Decedent] did not knowingly and voluntarily enter into the ADR Agreement. While [the court] cited to record evidence that [it] believed supported a conclusion of mental incapacity, [it] gives short shrift to evidence supporting the opposite conclusion. [Decedent's] treating physician, Dr. Kamran Tareen, noted on July 1, 2015 that her "MS (Mental Status) was at baseline."

Additionally, the Neurology Progress note, from the same day, noted that [Decedent] was "awake, alert, and oriented x3. Speech is fluent."

…

The situation here is virtually identical to **Cardinal**. There is evidence suggesting both impairment and lucidity. In such a case, as **Cardinal** instructs, there cannot be "clear and convincing" evidence of impairment sufficient to invalidate this agreement.

Additionally, the testimony of [Davis] further establishes that there was no significant impairment on the part of his wife at the time [Decedent] signed the June 2015 ADR Agreement. He was present, and watched her sign the June 2015 ADR Agreement. Per [Davis'] testimony, [Decedent] had a basic understanding that she was being readmitted to Kindred and that this document was part of the paperwork necessary to get her back into the Facility.

**Id.** at 17-18 (emphasis removed; reproduced record citations omitted).

We are guided by the following:

Arbitration agreements are matters of contract. Under Pennsylvania law, it is presumed that an adult is competent to enter into an agreement, and a signed document gives rise to the presumption that it accurately expresses the state of mind of the signing party. **Estate of McGovern v. Com. State Employees' Ret. Bd.**, 512 Pa. 377, 517 A.2d 523, 526 (Pa. 1986). To rebut this presumption, the challenger must present evidence of mental incompetency which is clear, precise and convincing. **Id.** This burden of proof requires that

the witnesses must be found to be credible, that the facts to which they testify are distinctly remembered and the details thereof narrated exactly and in due order, and that their testimony is so clear, direct, weighty and convincing as to enable the [finder of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

**Evans v. Marks**, 421 Pa. 146, 218 A.2d 802, 804 (Pa. 1966).

[W]here mental capacity to execute an instrument is at issue, the real question is the condition of the person at the

very time he executed the instrument . . . in question[. A] person's mental capacity is best determined by his spoken words and his conduct, and [] the testimony of persons who observed such conduct on the date in question outranks testimony as to observations made prior to and subsequent to that date. Mere mental weakness, if it does not amount to inability to comprehend the contract, and is unaccompanied by evidence of imposition or undue influence, is insufficient to set aside a contract.

*Id.* (citations and quotation marks omitted).

Moreover, "[i]t is well settled that mere weakness of intellect resulting from sickness or old age is not legal grounds to set aside an executed contract if sufficient intelligence remains to comprehend the nature and character of the transaction, and no evidence of fraud, mutual mistake or undue influence is present." *Taylor v. Avi*, 272 Pa. Super. 291, 415 A.2d 894, 897 (Pa. Super. 1979) (citations omitted). "[F]ailure of memory does not prove incapacity, unless it is total or so extended as to make incapacity practically certain. A testator may not be able at all times to recollect the names of persons or families of those with whom he has been intimately acquainted . . . and yet his understanding of the ordinary transactions of his life may be sound." *Id.*, quoting *Lawrence's Estate*, 286 Pa. 58, 132 A. 786, 789 (Pa. 1926).

*Cardinal v. Kindred Healthcare, Inc.*, 155 A.3d 46, 50 (Pa. Super. 2017), *appeal denied*, 170 A.3d 1063 (Pa. 2017).

Here, the trial court found the following:

Documents prepared by [Kindred's] own medical professional around the date the Agreement was signed by [Decedent] (June 19, 2015[2]), compel the conclusion that [Decedent's] thoughts were impaired at the time that she executed the Agreement and therefore she lacked the mental capacity to enter the Agreement. [Decedent's] admission records to [Kindred's] facility prepared by Kamran Tareen, M.D. dated June 20, 2015 reflect that [Decedent] was a 79 year woman with multiple complex medical issues including a large cerebellar infarction (stroke), Chronic Kidney Disease, IV, atrial fibrillation with pacemaker status, multiple myeloma (cancer of the plasma cells) in remission, stage II decubitis ulcer, sepsis due to a urinary

tract infection, history of C difficile colitis, sever[e] hypoproteinemia, and anemia. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). It is further noted that on June 12, 2015, approximately a week prior to her execution of the Agreement, she was found to have an acute change in mental status. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). The change in mental status was diagnosed as the result of a new left cerebellar infarction (stroke). (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). [Decedent] also had a subarachnoid area of hemorrhage and, although Dr. Tareen notes that [Decedent] is "oriented [to person, place and time]", he recommended that she follow-up with a neurologist for evaluation. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). It is further noted in the June 20, 2015 report that [Decedent] had a history of multiple episodes of having acute change of mental status with recovery. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiffs Complaint).

---

[2] The agreement is not dated by [Decedent] next to her signature; however, the agreement on page 1 is dated June 19, 2015. Just above [Decedent's] signature, the Agreement states, "IN WITNESS WHEREOF, the parties, intending to be legally bound, have signed this Agreement as of the date first written above". This date was June 19, 2015, the date of [Decedent's] admission to [Kindred's] facility. (Exhibit B of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). [Kindred] suggest[s] that the Agreement was signed on July 1, 2015 by [Decedent], when their representative executed the agreement, but the record does not support this. Additionally, [Kindred's] admissions coordinator's deposition testimony does not confirm the date on which [Decedent] signed the agreement.

---

In Dr. Tareen's progress note dated June 21, 2015, two (2) days after [Decedent] signed the Agreement, a CT scan was still pending of [Decedent] and he was still waiting on Neurology consults and Dr. Tareen notes that [Decedent] is "oriented [to person]" only. (Progress Note dated June 21, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). Further, as reflected in the June 21, 2015 note, when [Decedent] was asked if she ate breakfast that morning, she said she could not remember if she ate or not and therefore the doctor recommended that she be assisted with eating. (Progress Note dated June 21, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint).

Although the medical records submitted by [Kindred] reflect that [Decedent's] "[mental status ("MS")] was at baseline", there is no evidence of what her baseline was. (Progress Note dated July 1, 2015, Exhibit D of Defendants' Supplemental Memorandum of Law in Support of Defendants' Preliminary Objections to Enforce Alternative Dispute Resolution Agreement). Further, certain … medical records submitted by [Kindred] are dated July 1, 2015, the day their representative signed the Agreement, not the date that the Agreement reflects that it was signed by [Decedent]. In addition, although it is stated in Dr. Tareen's discharge summary dated July 20, 2015 that [Decedent] did not have any neurological defects, this was as of July 20, 2015, almost a month after [she] executed the Agreement and more than a month after she suffered her stroke. (Discharge Summary dated July 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). Lastly, [Kindred's] assertion that [Davis] testified that he believed that [Decedent] understood she was being admitted into the hospital and that signing the documents was a part of the admissions process does not speak conclusively to whether [Decedent] was competent to enter the Agreement. To the contrary, and more specific to the issue, [Davis], who was present when [Decedent] signed the Agreement, testified that [she] did not understand what the [admission] documents entailed and her conditions prevented her from signing the remaining admissions documents. (8/31/17 Horace Davis Deposition N.T. 31, 32, 46).

The record of this action establishes that, at the time that the Agreement was signed, [Decedent] was an elderly resident, with multiple health conditions, and was noted by [Kindred's] own

doctor as having an acute change in mental status a week before the execution of the Agreement, and this doctor believed as of June 20, 2015, the day after [Decedent] signed the Agreement, that a neurological evaluation was necessary. Her cognitive impairments, coupled with her age and medical conditions, undoubtedly affected her ability to understand the terms of a sophisticated legal agreement. Therefore, this Court finds that [Decedent] was incompetent at the time she entered the Agreement and therefore the Agreement that she signed dated June 19, 2015 is void.

Trial Court Opinion, 7/2/2018, at 5-8.

We note the court made several critical factual findings: (1) Decedent was an elderly woman with multiple complex medical issues, including several incidents of cerebellar infarctions (otherwise known as strokes) and she had a subarachnoid area of hemorrhage, and the treating physician had requested a neurological evaluation of Decedent;[4] (2) the June 20, 2015, medical admission report indicated Decedent had a history of multiple episodes of having acute changes of mental status with recovery; (3) although the medical records submitted reflected that Decedent's mental status was at baseline, there is no evidence of what her baseline was; and (4) Davis testified that he was present when Decedent signed the Agreement and she did not understand what the admission documents entailed and her condition prevented her from signing the remaining documents. Based on the totality of the circumstances,

---

[4]  The doctor subsequently indicated that two days after she signed the agreement, Decedent was oriented to person only and she could not remember if she ate breakfast that morning. *See* Trial Court Opinion, 7/2/2018, at 6.

Decedent endured an acute change in mental status around the same time she signed the document, specifically evidence of the recent cerebellar infraction and subarachnoid hemorrhage, which can reasonably be inferred as dispositive in determining that, while Decedent may have been oriented to person, place or time questions, there is clear and convincing evidence to support the trial court's finding that Decedent did not comprehend the **legal consequences** of the document she was signing.[5]   Furthermore, knowing that she was being admitted to Kindred, a place she had been before, does not equate to comprehending the legal consequences of the document she was signing.[6]

Moreover, we find ***Cardinal***, ***supra***, which Kindred relies on, distinguishable from the present matter.   In reversing the trial court's decision, a panel of this Court determined there did not exist clear, precise,

---

[5]  This is supported by the fact that Davis stated she did not sign any other documents that day.  **See** Defendant's Supplemental Memorandum of Law in Support of Defendants' Preliminary Objection to Enforce the Alternative Dispute Resolution Agreement, 10/25/2017, at Exhibit C, Deposition of Horace Davis, 8/31/2017, at 31-32("Q.  Okay.  And were you concerned at all with her signing this document?  A. No.  Q.  Okay.  Did you think she understood? A.  I don't know what you mean by understood.  She understood that she was being admitted to the hospital and this is part of the stuff that was necessary to get her back into the facility.  Q.  Okay.  Do you know if she signed the other admissions document?  A.  The other admissions document?  Q.  Did she sign or did you sign them?  A.  I think I signed the other.  Q. You signed the other.  Why was that?  A.  Because her hand wasn't steady and there was some conditions that prevented her from signing.").

[6]  Moreover, that initial agreement, dated March 12, 2015, was signed by Davis and not Decedent.

and convincing evidence to support the court's finding that the decedent lacked capacity to enter into the arbitration agreement. *See Cardinal*, 155 A.3d at 51. First, the panel concluded "the trial court's focus on the knowledge possessed by [the hospital] employee … regarding the contents and implications of the agreement [wa]s misplaced" because it was "irrelevant to this inquiry what [the hospital employee] knew or did not know about the agreement" as the "concern is whether clear and convincing evidence exists on the record to demonstrate that [the d]ecedent lacked capacity to enter into the contract." *Id.* Second, the panel "flatly reject[ed] the trial court's reliance on the fact that [the d]ecedent had, some years prior to signing the agreement, executed a power of attorney in favor of his nephew," the appellee in the appeal, because "mere existence of a power of attorney can in no way be construed as indicia of incapacity on the part of the principal." *Id.* Lastly, the panel found the trial court omitted certain medical evidence concerning the decedent was "'awake, alert, [and] oriented" on [the date of admission] and 'alert [and] oriented' on … the very date the agreement was executed[.]" *Id.* at 52. Furthermore, while the trial court noted that the hospital employee had observed the decedent having difficulty affixing his signature to the agreement, the employee's deposition testimony also revealed that she "went on to acknowledge that she actually had no independent recollection of [the d]ecedent's ability to sign his name during her meeting with him" and the decedent "was able to express other preferences, such as his desire to decline

the facility's assistance with the management of his personal funds and his wish to have his bills submitted directly to Medicare." *Id.*

Here, the court did not rely on the deposition statements made by Kindred's employee to analyze Decedent's state of mind at the time signed the agreement. Second, there was no argument put forth by Davis that Decedent was incapacitated due to executing a power of attorney. Third, there was no evidence presented in *Cardinal* that the decedent had suffered a stroke a week prior to signing the admission documents and acute changes in mental status like in the present matter. Accordingly, Kindred's first argument fails.

Next, Kindred claims the trial court erred in finding that Davis had no legal authority to waive his wife's rights under the Survival Act[7] when he signed the Agreements. Kindred's Brief at 20. Rather, Kindred alleges Davis had Decedent's express verbal consent to sign the Agreements on her behalf. *Id.* It also asserts there was evidence of apparent authority and authority by estoppel to establish Davis had legal authority to sign the documents at issue. In support of this argument, Kindred points to the following:

> [Davis'] testimony establishes that he did in fact have his wife's express verbal authority to sign admission papers on her behalf. The authority was granted to him by his wife, based on their continuous, repeated affirmations of agreement. [Davis']

---

[7] *See* 42 Pa.C.S. § 8302 ("All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants.").

testimony confirms that this process was done with [Decedent's] knowledge and consent.

…

As is clear from the testimony of [Davis], he consistently acted on his wife's behalf, with her consent. Upon [Decedent's] admission to Kindred, it was their joint decision that he would get her signed in and settled, based on their long-standing course of conduct, and, in essence, a meeting of their minds prior to her admission.

…

[Davis'] actions on behalf of his wife constituted a reasonable basis upon which the admission person could rely in having him sign the admission documents. [Davis], with the approval of [Decedent], held himself out as the legal representative in signing the documents. Although [Davis] did not have a formal Power of Attorney document, it is clear that the existence of the relationship, in the context of an ongoing course of conduct (where [the husband and wife] executed admissions documents together and agreed on the disposition of her admission), establishes express or apparent agency, and/or agency by estoppel.

…

By signing the underlying Agreement, [Davis] acknowledged that he was voluntarily relinquishing the right to a jury trial in favor of Alternative Dispute Resolution, on behalf of his wife, with whom he conferred daily, and kept watch over. It was more than reasonable for Kindred staff to rely upon [Davis] as his wife's authorized agent. There is no evidence that [Decedent], who was present in the Hospital for all those weeks, did anything to disavow Kindred staff of the idea that her husband, who happened to be a retired Magisterial Judge, could be counted on to act in her best interests, and with her consent. During his testimony, [Davis] made it clear that he and his wife communicated daily as to virtually all her healthcare decision-making. Kindred reasonably relied on those manifestations of his authority to allow him to sign off on the pertinent paperwork. It is also clear from [Davis'] testimony that he understood the basic components of the ADR Agreement.

*Id.* at 21-24.

Initially, we note the trial court found this issue was waived for Kindred's failure to include in its concise statement. *See* Trial Court Opinion, 7/2/2018, at 8 n.2 ("Although this Court addresses whether [Davis] had the authority to execute the March 13, 2015 and July 30, 2015 Agreements, [Kindred has] waived their ability to challenge this issue by not including it in their Concise Statement of Matters Complained of on Appeal."). We reviewed the concise statement,[8] and are in agreement with the trial court that Kindred did not list an agency argument in its therein concise statement. Accordingly, Kindred

_____

[8] Rather, Kindred's concise statement identifies the following issues:

> 1. Whether the Trial Court erred in refusing to enforce the ADR agreement signed by decedent Grace Kelly Davis, a retired nurse, where Plaintiff failed to meet her burden of proof to establish evidence that Mrs. Davis lacked capacity to enter into the agreement?.
>
> 2. Whether the Trial Court erred in refusing to enforce the two ADR agreements signed by decedent's husband (a retired Magisterial Judge), despite Mr. Davis' unequivocal acknowledgment of his understanding of the arbitration agreements?
>
> 3. Whether the Trial Court erred in refusing to enforce valid ADR agreements, signed over multiple admissions by decedent's husband (a retired Magisterial Judge) and the decedent (a retired nurse, Grace Kelly Davis), given husband's testimony that the documents were presented, explained, reviewed and signed by the admissions staff?

Concise Statement of Errors Complained of on Appeal, 5/17/2018, at 2.

has waived this issue. *See* Pa.R.A.P. 1925(b)(4)(vii) ("Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.").[9]

Assuming arguendo Kindred had not waived this issue, this argument is unavailing. With respect to the issue of agency, we are guided by the following:

> "Agency is the relationship which results from the consent of one person that another may act on his behalf." ***Lincoln Avenue Industrial Park v. Norley***, 450 Pa. Super. 621, 677 A.2d 1219, 1222 (Pa. Super. 1996) (citation omitted). "The creation of an agency relationship requires no special formalities." ***Walton***, 66 A.3d at 787 (citation omitted). "The existence of an agency relationship is a question of fact." ***Id.*** "The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence." ***Id.***
>
> An agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel. Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters. Implied authority exists in situations where the agent's actions are "proper, usual and necessary" to carry out express agency. Apparent authority exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal.
>
> ***Walton***, 66 A.3d at 786 (citations omitted) (emphasis added).

---

[9] ***See also Commonwealth v. Johnson***, 107 A.3d 52, 69 n.7 (Pa. 2014) (finding Rule 1925 waiver applied because appellant failed to include a claim in his concise statement), *cert. denied*, 136 S. Ct. 43 (U.S. 2015).

*McIlwain v. Saber Healthcare Grp., Inc., LLC*, 208 A.3d 478, 485 (Pa.
Super. 2019). Moreover, "[t]he basic elements of agency are the
manifestation by the principal that the agent shall act for him, the agent's
acceptance of the undertaking and the understanding of the parties that the
principal is to be in control of the undertaking." *Walton*, 66 A.3d at 787
(citation omitted). Additionally, "[a]gency cannot be inferred from mere
relationships or family ties." *Wisler v. Manor Care of Lancaster PA, LLC*,
124 A.3d 317, 323 (Pa. Super. 2015) (citation omitted), *appeal denied*, 128
A.3d 222 (Pa. 2015).

Here, the trial court found the following:

As there is no written document granting [Davis] express
authority or to establish implied authority, [Kindred] maintain[s]
there was apparent agency and/or agency by estoppel. Apparent
agency and agency by estoppel focus on the words and conduct
of the principal, [Decedent]. "An agent cannot simply by his own
words, invest himself with apparent authority. Such authority
emanates from the action of the principal and not the agent." To
prevail on a claim of agency by estoppel on the issue of authority
to sign the Agreements, [Kindred] must prove that [Decedent]
intentionally or carelessly caused [Kindred's] admissions
coordinator to believe an agency relationship existed, or knowing
that the admissions coordinator held such a belief, [Decedent] did
not take reasonable steps to clarify the facts.

[Kindred] ha[s] failed to offer any evidence of [Decedent's]
conduct at the time the Agreements were executed or her conduct
with the admissions coordinator at any time before execution of
the Agreements. There is no evidence that [Decedent] knew
[Davis] was executing the Agreements specifically. Neither
[Davis] nor [Kindred's] admissions coordinator could recall
whether [Decedent] was present in the room when the
Agreements were executed by [Decedent]. (8/31/17 Horace
Davis Deposition N.T. 22-23 and 8/31/17 Lilia Margolies
Deposition N.T. 27-28). [Davis] also testified that he did not tell

- 20 -

[Decedent] about the Agreements or the fact that he signed them, and Mrs. Davis did not instruct him to sign the Agreements. (8/31/17 Horace Davis Deposition N.T. 23, 40, 47). It is irrelevant whether [Decedent] had given [Davis] express verbal authority to sign the admissions paperwork in general, as [Kindred] argues, unless this verbal authority was given while [Kindred's] representative was present such that [Decedent's] words caused the admissions coordinator to believe that [Decedent] had granted [Davis] the authority to act. There is no evidence of such. Further, there is no evidence that [Decedent] verbally gave [Davis] the authority to sign the Agreements specifically. Lastly, there cannot be agency by estoppel because [Kindred] have offered no evidence of [Decedent's] negligence.

Trial Court Opinion, 7/2/2018, at 9-10 (citation omitted). We agree with the court's conclusion and would affirm on the basis of the court's opinion as a review of the evidence reveals "there was no express, implied, or apparent authority, nor authority by estoppel to establish an agency relationship" between Decedent and Davis in relation to signing the arbitration agreements. *McIlwain*, 208 A.3d at 485-486.

Lastly, Kindred complains the court erred in finding that the agreement was void due to unconscionability. *See* Kindred's Brief at 24-33. Kindred states:

The basic thrust of [the trial court's] analysis appears to be grounded in the idea that the ADR Agreement is one-sided, and that it did not clearly indicate that the Agreement was voluntary, and that the Agreement was not adequately explained to [Davis or Decedent]. However, if taken to its logical conclusion, it seems clear that this Decision, if left to stand, would void every single nursing home ADR or Arbitration Agreement in the Commonwealth of Pennsylvania, because, in the trial court's view, it appears that all such Agreements are one-sided, and can never be fair to both the facility and the resident. That, however, is not the law.

- 21 -

> The trial court's Opinion striking down the ADR Agreement in this case was not an objective assessment of the ADR Agreement and witness testimony. The court's expressed view is in complete contravention of numerous precedents from this court, the Supreme Court of Pennsylvania, and the Supreme Court of the United States, which hold that the federal and state interests in favoring arbitration of disputes are paramount and play a central factor in determining whether Agreements, such as the one at issue here, should be enforced.

Kindred's Brief at 24-25.

Because we previously determined that (1) the court correctly found Decedent was an incapacitated person at the time she signed the June, 19, 2015, arbitration agreement which prevented her from knowingly entering into the contract, and (2) Kindred waived any argument concerning any authority on the part of Davis to sign the March 13, 2015, and July 30, 2015, Arbitration Agreements and thereby legally bound himself and Decedent, we need not reach the issue of whether the Arbitration Agreements were unconscionable.

Accordingly, we conclude the trial court did not err in entering the March 27, 2018, order overruling their preliminary objections to the complaint filed by Davis.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/19

IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CIVIL ACTION – LAW

| | | |
|---|---|---|
| Horace Davis, Administrator of the | : | **No. 17-001749** |
| Estate of Grace Kelly Davis, Deceased | : | PA Superior Court Docketing No. 1048 EDA 2018 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| 2507 Chestnut Street Operations, LLC | : | |
| d/b/a The Belvedere Center | : | |
| Genesis Healthcare, LLC, Delaware County | : | |
| Memorial Hospital, Crozer Chester Medical | : | |
| Center, Crozer-Keystone Health System, | : | |
| Kindred Hospital Philadelphia-Havertown, | : | |
| Kindred Hospital East, LLC, Kindred | : | |
| Healthcare, Inc., Mercy Catholic Medical Center | : | |
| of Southeastern Pennsylvania d/b/a Mercy | : | |
| Fitzgerald Hospital, Mercy Health System of | : | |
| Southeastern Pennsylvania | : | |
| Defendants. | : | |

CHRISTOPHER J. CULLETON, ESQUIRE, Attorney for Plaintiff
WILLIAM J. MUNDY, ESQUIRE, JOHN M. SKROCKI, ESQUIRE, LAKEISHA R.
ROBINSON, ESQUIRE, Attorneys for Defendants

## OPINION

BURR, S.J.                                                   FILED:  July 2, 2018

Defendants, Kindred Hospital Philadelphia-Havertown, Kindred Hospital East,

LLC and Kindred Healthcare, Inc. (hereinafter "Defendants") have appealed from this Court's

Order of March 27, 2018 overruling their Preliminary Objections to Plaintiff's Complaint in this

medical professional liability action. In their Preliminary Objections, Defendants requested this

Court to direct the parties to arbitration pursuant to Pa.R.C.P. 1028(a)(6) on Plaintiff's survival

claims in accordance with the Voluntary Arbitration Agreements (hereinafter "Agreements")

executed by the decedent, Grace Kelly Davis, and her husband, Horace Davis (hereinafter

# ADDENDUM C



"Plaintiff"). The Agreements were allegedly executed on or about March 13, 2015 by Plaintiff, on or about June 19, 2015 by decedent, Mrs. Davis, and on or about July 31, 2015 by Plaintiff at the time of three separate admissions of Mrs. Davis to Defendants' facility[1]. The disposition of Defendants' Preliminary Objections by this Court turned on whether or not the Agreements are valid and enforceable.

The alleged facts underlying this dispute are set forth in Plaintiff's Complaint filed on February 17, 2017. Mrs. Davis entered Kindred Hospital Philadelphia-Havertown, owned and operated by Defendants, Kindred Hospital East, LLC and Kindred Healthcare, Inc., on April 2, 2015 and remained in the facility through April 20, 2015. (¶ 34 of Complaint). Upon admission, she presented with pressure ulcers which persisted and deteriorated during her stay at Defendants' facility. (¶¶ 33, 35 of Complaint). Mrs. Davis was again admitted to Kindred Hospital Philadelphia-Havertown on June 19, 2015; this admission lasted until July 9, 2015 during which time her same wounds persisted and deteriorated. (¶¶ 39, 40 of Complaint). Mrs. Davis was again admitted to Kindred Hospital Philadelphia-Havertown on July 13, 2015; this admission lasted until July 20, 2015 during which time her same wounds persisted and deteriorated. (¶¶ 43, 44, 45 of Complaint). Mrs. Davis was last admitted to Kindred Hospital Philadelphia-Havertown on July 30, 2015; this admission lasted until August 25, 2015 during which time her same wounds persisted and deteriorated further to a stage of IV. (¶¶ 47, 48 of Complaint). Throughout Mrs. Davis' stay at the Defendants' facility, she allegedly received inadequate care and treatment. (¶ 103 of Complaint). Mrs. Davis died on November 20, 2015 and Plaintiff alleges that the pressure ulcers, which were caused solely and exclusively by the conduct of all Defendants (and/or their respective agents, servants, employees) caused and/or contributed to her demise. (¶¶ 49, 50 of Complaint).

---

[1] Each one of the Agreements is identical and contain the same terms.

2

On March 22, 2017, Defendants filed Preliminary Objections to Plaintiff's Complaint seeking to compel arbitration of Plaintiff's claims under the Agreements that had been executed by Plaintiff and Mrs. Davis. (¶¶ 5, 8 of Preliminary Objections). On April 11, 2017, Plaintiff responded to Defendants' Preliminary Objections asserting that the Agreements are unenforceable as Mrs. Davis lacked the mental capacity to enter into the Agreement she executed, that Plaintiff lacked the authority to bind Mrs. Davis to the Agreements he executed, that the Agreements are unconscionable contracts of adhesion, and that enforcing the Agreements would deny the wrongful death beneficiaries their constitutional right to a jury trial. (¶ IV of Plaintiff's Memorandum of Law in Opposition to Kindred Defendants' Preliminary Objections to Plaintiff's Complaint). Defendants filed a Supplemental Memorandum of Law on April 25, 2017 in response to Plaintiff's Answer and asserted that Plaintiff failed to meet the burden of showing that Mrs. Davis was "incompetent" to enter into the Agreement that she signed, that Plaintiff had apparent authority and/or agency by estoppel was established to execute the Agreements he signed, that the Agreements are not unconscionable as the Pennsylvania Superior Court did not find unconscionable an agreement to arbitrate that was similar in all material respects to the Agreements at issue, and that the facts averred in Plaintiff's Complaint do not support a wrongful death claim. (¶ I(A-D) of Defendants' Supplemental Memorandum of Law in Support of Defendants' Preliminary Objections to Enforce Alternative Dispute Resolution Agreement). Further, Defendants requested discovery in the form of a deposition of Plaintiff and request for production of documents. (¶ D of Defendants' Supplemental Memorandum of Law in Support of Defendants' Preliminary Objections to Enforce Alternative Dispute Resolution Agreement).

3

On July 13, 2017, this Court entered an Order granting additional time for the parties to conduct discovery and supplement the record as deemed necessary on issues relating to the validity and/or enforceability of the Agreements. On October 25, 2017, upon completion of the additional discovery permitted by the Court, which included the depositions of the Defendants' Admissions Coordinator and Plaintiff, Defendants filed a Supplemental Memorandum of Law in support of their position to enforce the Agreements. On October 26, 2017, Plaintiff filed a Supplemental Memorandum of Law in support of his position. On March 27, 2018, this Court entered an Order overruling Defendants' Preliminary Objections to Plaintiff's Complaint from which Defendants took their appeal on April 4, 2018.

Defendants' Preliminary Objections were properly overruled as Mrs. Davis did not have the requisite mental capacity to enter the Agreement, Plaintiff did not have authority to enter the Agreements and the Agreements are unconscionable. As such, the Agreements requiring the parties to proceed to arbitration are each unenforceable as a whole and this action should remain before this Court.

"A written agreement to subject any existing controversy to arbitration or a provision in a written agreement to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity relating to the validity, enforceability or revocation of any contract." 42 Pa.C.S. § 7303.

In Weir v. Estate of Ciao, 556 A.2d 819, 824 (Pa. 1989), the Supreme Court noted the applicable analysis when there exists a challenge to the mental capacity of a person who signs a contract:

4

"Written instruments are not to be set aside except upon convincing testimony that their execution was tainted with fraud, either actual or constructive, or that the person so executing them did not have what the law considers sufficient mental capacity to do so. (citation omitted). Contracts made with an incompetent before his adjudication as weak minded are voidable and can be avoided only on proper showing that he was incompetent at the time. (citation omitted). When mental competency is at issue the real question is the condition of the person at the very time he made the gift or executed the instrument. (citation omitted). Competence is best determined by a person's words and acts. The testimony of persons who observed the alleged incompetent on the date in question is generally superior to testimony as to observations made prior to and subsequent to that date. Ordinarily, competence is presumed and the burden of proof is upon the person who alleges the incompetence." (citation omitted).

To rebut the presumption of competence, "the challenger must present evidence of mental incompetency which is 'clear, precise and convincing'". Estate of McGovern v. Com. State Employees' Ret. Bd., 517 A.2d 523, 526 (Pa. 1986). Moreover, "[i]t is well settled that mere weakness of intellect resulting from sickness or old age is not legal grounds to set aside an executed contract if sufficient intelligence remains to comprehend the nature and character of the transaction, and no evidence of fraud, mutual mistake or undue influence is present." Taylor v. Avi, 415 A.2d 894, 897 (Pa. Super. 1979) (citations omitted).

Documents prepared by Defendants' own medical professional around the date the Agreement was signed by Mrs. Davis (June 19, 2015[2]), compel the conclusion that Mrs. Davis' thoughts were impaired at the time that she executed the Agreement and therefore she lacked the mental capacity to enter the Agreement. Mrs. Davis' admission records to Defendants' facility prepared by Kamran Tareen, M.D. dated June 20, 2015 reflect that Mrs. Davis was a 79 year woman with multiple complex medical issues including a large cerebellar infarction (stroke), Chronic Kidney Disease, IV, atrial fibrillation with pacemaker status, multiple myeloma (cancer

---

[2] The agreement is not dated by Mrs. Davis next to her signature; however, the agreement on page 1 is dated June 19, 2015. Just above Mrs. Davis' signature, the Agreement states, "IN WITNESS WHEREOF, the parties, intending to be legally bound, have signed this Agreement as of the date first written above". This date was June 19, 2015, the date of Mrs. Davis' admission to Defendants' facility. (Exhibit B of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). Defendants suggest that the Agreement was signed on July 1, 2015 by Mrs. Davis, when their representative executed the agreement, but the record does not support this. Additionally, Defendants' admissions coordinator's deposition testimony does not confirm the date on which Mrs. Davis signed the agreement.

5

of the plasma cells) in remission, stage II decubitis ulcer, sepsis due to a urinary tract infection, history of C difficile colitis, sever hypoproteinemia, and anemia. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). It is further noted that on June 12, 2015, approximately a week prior to her execution of the Agreement, she was found to have an acute change in mental status. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). The change in mental status was diagnosed as the result of a new left cerebellar infarction (stroke). (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). Mrs. Davis also had a subarachnoid area of hemorrhage and, although Dr. Tareen notes that Mrs. Davis is "oriented [to person, place and time]", he recommended that she follow-up with a neurologist for evaluation. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). It is further noted in the June 20, 2015 report that Mrs. Davis had a history of multiple episodes of having acute change of mental status with recovery. (Admission Report dated June 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint).

In Dr. Tareen's progress note dated June 21, 2015, two (2) days after Mrs. Davis signed the Agreement, a CT scan was still pending of Mrs. Davis and he was still waiting on Neurology consults and Dr. Tareen notes that Mrs. Davis is "oriented [to person]" only. (Progress Note dated June 21, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). Further, as reflected in the June 21, 2015 note, when Mrs. Davis was asked if she ate breakfast that morning, she said she could

6

not remember if she ate or not and therefore the doctor recommended that she be assisted with eating. (Progress Note dated June 21, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint).

Although the medical records submitted by Defendants reflect that Mrs. Davis' "MS was at baseline", there is no evidence of what her baseline was. (Progress Note dated July 1, 2015, Exhibit D of Defendants' Supplemental Memorandum of Law in Support of Defendants' Preliminary Objections to Enforce Alternative Dispute Resolution Agreement). Further, certain of the medical records submitted by Defendants are dated July 1, 2015, the day their representative signed the Agreement, not the date that the Agreement reflects that it was signed by Mrs. Davis. In addition, although it is stated in Dr. Tareen's discharge summary dated July 20, 2015 that Mrs. Davis did not have any neurological defects, this was as of July 20, 2015, almost a month after Mrs. Davis executed the Agreement and more than a month after she suffered her stroke. (Discharge Summary dated July 20, 2015, Exhibit C of Plaintiff's Answer in Opposition to Defendants' Preliminary Objections to Plaintiff's Complaint). Lastly, Defendants assertion that Plaintiff testified that he believed that Mrs. Davis understood she was being admitted into the hospital and that signing the documents was a part of the admissions process does not speak conclusively to whether Mrs. Davis was competent to enter the Agreement. To the contrary, and more specific to the issue, Plaintiff, who was present when Mrs. Davis signed the Agreement, testified that Mrs. Davis did not understand what the [admission] documents entailed and her conditions prevented her from signing the remaining admissions documents. (8/31/17 Horace Davis Deposition N.T. 31, 32, 46).

The record of this action establishes that, at the time that the Agreement was signed, Mrs. Davis was an elderly resident, with multiple health conditions, and was noted by the

Defendants' own doctor as having an acute change in mental status a week before the execution of the Agreement, and this doctor believed as of June 20, 2015, the day after Mrs. Davis signed the Agreement, that a neurological evaluation was necessary. Her cognitive impairments, coupled with her age and medical conditions, undoubtedly affected her ability to understand the terms of a sophisticated legal agreement. Therefore, this Court finds that Mrs. Davis was incompetent at the time she entered the Agreement and therefore the Agreement that she signed dated June 19, 2015 is void.

Furthermore, in order for the Agreements executed on March 13, 2015 and July 31, 2015 by Plaintiff to be binding upon Mrs. Davis, there must have existed at the time of execution an agency relationship between Mrs. Davis and Plaintiff [3]. Such a relationship "...cannot be inferred from mere relationship or family ties unattended by conditions, acts or conduct clearly implying an agency." Walton v. Johnson, 66 A.3d 782, 787 (Pa. Super. 2013)(citations omitted). Rather, "...an agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel." Id. at 786.

"Express authority exists where the principal deliberately and specifically grants authority to the agent as to certain matters. Implied authority exists in situations where the agent's actions are "proper, usual and necessary" to carry out express agency. Apparent agency exists where the principal, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. Authority by estoppel occurs when the principal fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal." Id. (citations omitted).

---

[3] Although this Court addresses whether Plaintiff had the authority to execute the March 13, 2015 and July 30, 2015 Agreements, Defendants' have waived their ability to challenge this issue by not including it in their Concise Statement of Matters Complained of on Appeal.

8

As there is no written document granting Plaintiff express authority or to establish implied authority, Defendants maintain there was apparent agency and/or agency by estoppel. Apparent agency and agency by estoppel focus on the words and conduct of the principal, Mrs. Davis. "An agent cannot simply by his own words, invest himself with apparent authority. Such authority emanates from the action of the principal and not the agent." Id. at 787 (citations omitted). To prevail on a claim of agency by estoppel on the issue of authority to sign the Agreements, Defendants must prove that Mrs. Davis intentionally or carelessly caused Defendants' admissions coordinator to believe an agency relationship existed, or knowing that the admissions coordinator held such a belief, Mrs. Davis did not take reasonable steps to clarify the facts. Id. at 788.

Defendants have failed to offer any evidence of Mrs. Davis' conduct at the time the Agreements were executed or her conduct with the admissions coordinator at any time before execution of the Agreements. There is no evidence that Mrs. Davis knew Plaintiff was executing the Agreements specifically. Neither Plaintiff nor Defendants' admissions coordinator could recall whether Mrs. Davis was present in the room when the Agreements were executed by Plaintiff. (8/31/17 Horace Davis Deposition N.T. 22-23 and 8/31/17 Lilia Margolies Deposition N.T. 27-28). Plaintiff also testified that he did not tell Mrs. Davis about the Agreements or the fact that he signed them, and Mrs. Davis did not instruct him to sign the Agreements. (8/31/17 Horace Davis Deposition N.T. 23, 40, 47). It is irrelevant whether Mrs. Davis had given Plaintiff express verbal authority to sign the admissions paperwork in general, as Defendant argues, unless this verbal authority was given while Defendants' representative was present such that Mrs. Davis' words caused the admissions coordinator to believe that Mrs. Davis had granted Mr. Davis the authority to act. There is no evidence of such. Further, there is no evidence that Mrs.

9

Davis verbally gave Plaintiff the authority to sign the Agreements specifically. Lastly, there cannot be agency by estoppel because Defendants have offered no evidence of Mrs. Davis' negligence.

The Agreements are also unconscionable contracts of adhesion. The case of Mannion v. Manor Care, Inc., 4 Pa. D. & C. 5th 321 (Pa. Ct. Com. Pl. 2006) considered arbitration provisions similar to those *sub judice*. The Mannion Court found the agreement to arbitrate to be a contract of adhesion. "A contract of adhesion is defined as a standard form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who has little choice about the terms." Mannion at 329-330 (citing Hugel v. Mifflin Construction Company, Inc., 796 A.2d 350, 357 (Pa. Super. 2002)). In finding the agreement to be a contract of adhesion, the Court stated as follows:

> The Agreement at issue falls within this definition [definition for contract of adhesion]. It was a standard form document prepared by ManorCare for signature by new residents . . . Given the circumstances, Ms. Mannion was in a weaker position without any meaningful choice when she signed the agreement . . . . When Ms. Mannion received the faxed paperwork, consisting of 21 pages, she did not have time to read the material carefully before signing and returning the documents. She was very upset at that time and recalls the experience only as a blur . . . Ms. DeFranco never explained the arbitration agreement to her. Nor was Ms. Mannion informed that she could make changes in the preprinted documents.
>
> . . . Considering the pressure she was under during this period of time, it is understandable that she felt she had little choice but to sign the documents as presented . . . Thus, we find that the agreement was a contract of adhesion." Id. at 330-331.

The circumstances attendant to Mrs. Davis' and Plaintiff's execution of the Agreements were similar to the circumstances in Mannion. With respect to Mrs. Davis' execution of the Agreement, she had been in and out of medical facilities for various months upon her admission in June 2015 to Defendants' facility. She was riddled with various medical conditions and disabilities attendant to same. Plaintiff testified that, although Mrs. Davis signed the Agreement in June 2015, her conditions prevented her from signing the remaining

10

admissions documents. (8/31/17 Horace Davis Deposition N.T. 31, 32). Plaintiff was the elderly husband of a very ill spouse and was responsible for her care on a full time basis. With respect the March 13, 2015 Agreement, Plaintiff testified that he was presented the Agreement with a many other documents, that he did not read them because his main concern was getting his wife the care she needed, and that he felt like he had to sign the documents. (8/31/17 Horace Davis Deposition N.T. 19, 20, 21). With respect to the July 31, 2015 Agreement, Plaintiff stated that time was essential to get Mrs. Davis admitted to the facility so he did not take the time to read the Agreement and get some understanding of it. (8/31/17 Horace Davis Deposition N.T. 38, 41).

Lilia Margolies was Admissions Coordinator for Defendants' facility at the time of execution of the Agreements. In her capacity as Admissions Coordinator, she would present the form Agreement to all residents or their representative. (8/31/17 Lilia Margolies Deposition N.T. 13). She testified that the patients would review approximately twenty seven pages of documents for the admissions process within five to ten minutes, four pages of which consisted of the Agreement. (8/31/17 Lilia Margolies Deposition N.T. 14, 21). She further testified in her deposition that approximately 20% of the time she would just leave the admissions packet in the patient's room and would not be physically present to explain the documents when the patient or their representative signed the Agreement and would simply come back to retrieve the signed documents, including the Agreement. (8/31/17 Lilia Margolies Deposition N.T. 14-15). When she was present, she would explain the terms of the arbitration agreement to the patient or their representative. (8/31/17 Lilia Margolies Deposition N.T. 17-19). In her two (2) years on the job, she never once revised or altered the terms of the Agreement. (8/31/17 Lilia Margolies Deposition N.T. 30). These facts clearly show that Mrs. Davis and Plaintiff were in a

11

significantly weaker bargaining position than Defendants and had no choice about the terms of the Agreement. For these reasons, this Court found the Agreements to be contracts of adhesion.

However, "[a] contract of adhesion is not *ipso facto* unenforceable. It is unenforceable only to the extent that it is found to be unconscionable." Mannion, 4 Pa. D. & C. 5th at 331. "A contract term is unconscionable if (1) the party challenging it has no reasonable choice in accepting it, as in the case of a contract of adhesion, and (2) the provision unreasonably favors the other party." Id. (citing Lytle v. CitiFinancial Services, Inc., 810 A.2d 643 (Pa. Super. 2002)). In Pennsylvania, unconscionability requires a showing that the contract was both procedurally and substantively unconscionable when made. Witmer v. Exxon Corp., 434 A.2d 1222, 1228 (Pa. 1981). Procedural unconscionability refers to the process in which an agreement is reached and may be found where parties to the contract have unequal bargaining power. See Germantown Mfg. Co. v. Rawlinson, 491 A.2d 138, 145-46 (Pa. 1985); Moscatiello v. Pittsburgh Contractors Equip. Co., 595 A.2d 1190, 1196-97 (Pa. 1991). An agreement is substantively unconscionable when it unreasonably favors the drafter. Huegel v. Mifflin Const. Co., Inc., 796 A.2d 350, 357 (Pa. Super. 2002). Substantively, unconscionability may also be based on a violation of public policy. Hall v. Amica Mut. Inc. Co., 648 A.2d 755 (Pa. 1994).

The Agreements are procedurally unconscionable as they are contracts of adhesion for the reasons set forth herein. At the time that the Agreements were executed, Mrs. Davis and Plaintiff were in a highly emotional state after Mrs. Davis had spent months in and out of health care facilities battling a myriad of serious health concerns, including cancer. Defendants' admission coordinators had presented this Agreement approximately 40 times a month to new patients. (8/31/17 Lilia Margolies Deposition N.T. 29). There was a gross disparity in bargaining power between the parties for these reasons.

The Agreements are also procedurally unconscionable as they violate public policy. Although the arbitration process was possibly explained, it was never properly explained what rights Mrs. Davis was giving up. (8/31/17 Lilia Margolies Deposition N.T. 18-19). A waiver of the right to a trial by jury must be knowing and voluntary. In determining whether there was a knowing, voluntary and intelligent waiver, the courts look to whether "(1) there was no gross disparity in bargaining power between the parties; (2) the parties are sophisticated business entities; (3) the parties had an opportunity to negotiate the contract terms; and (4) the waiver provision was conspicuous." First Union National Bank v. U.S., 164 F. Supp. 2d 660, 663 (E.D. Pa. 2001). Mrs. Davis and Plaintiff, both elderly adults – one very ill and the other placed into a position as a full time care giver for his ill wife, entered a contract with a highly sophisticated corporate entity with no emotional attachment to the situation. It was never explained to Mrs. Davis or Plaintiff that they could negotiate the terms of the Agreement. (8/31/17 Lilia Margolies Deposition N.T. 18-19). It must be noted that Ms. Margolies testified in her deposition that the Agreement had never been revised during her two (2) years acting as Admissions Coordinator. (8/31/17 Lilia Margolies Deposition N.T. 30).

Defendants cite MacPherson v. Magee Memorial Hosp. for Convalescence, 128 A.3d 1209 (Pa. Super. 2015) and Cardinal v. Kindred Healthcare, Inc., 155 A.3d 46 (Pa. Super. 2017) where the Superior Court examined arbitration agreements and concluded that the agreements were not procedurally or substantively unconscionable. In making its decision, the McPherson Court noted (on which the Cardinal Court relied also) that the agreement at issue had "a conspicuous, large, bolded notification that the parties, by signing, are waiving the right to a trial before a judge or jury . . . [and] a notification at the top of the agreement, in bold typeface and underlined, that it is voluntary, and if the patient refuses to sign it, 'the Patient will still be

13

allowed to live in, and receive services' at the facility." Cardinal v. Kindred Healthcare, Inc., 155 A.3d at 53 (citing MacPherson v. Magee Memorial Hosp. for Convalescence, 128 A.3d at 1221-22). The Agreements in the instant matter can be distinguished from the McPherson and Cardinal agreements. In McPherson, the heading of the arbitration agreement at issue read: **"VOLUNTARY AGREEMENT: If you do not accept this Agreement, the Patient will still be allowed to live in, and receive services in, this Center."** The very first sentence of the agreement read in bold: **"BY ACCEPTING THIS AGREEMENT, THE PARTIES ARE WAIVING THEIR RIGHT TO A TRIAL BEFORE A JUDGE AND/OR A JURY OF ANY DISPUTE BETWEEN THEM. PLEASE READ THIS AGREEMENT CAREFULLY AND IN ITS ENTIRETY BEFORE ACCEPTING ITS TERMS."** MacPherson v. Magee Memorial Hosp. for Convalescence, 128 A.3d 1209, 1213-14 (Pa. Super. 2015). The Cardinal agreement stated at the very top: "THIS AGREEMENT IS NOT A CONDITION OF ADMISSION TO OR CONTINUED RESIDENCE IN THE FACILITY." Also, highlighted in boldface, underlined, capital letters on the first page of the agreement is a statement that: **THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT BY ENTERING INTO THIS AGREEMENT THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED BY A COURT OF LAW OR TO APPEAL ANY DECISION OR AWARD OF DAMAGES RESULTING FROM THE ADR PROCESS EXCEPT AS PROVIDED HEREIN.** 155 A. 3d at 53-54.

In the instant matter, the Agreements are titled "VOLUNTARY ALTERNATIVE DISPUTE RESOLUTION AGREEMENT BETWEEN PATIENT AND HOSPITAL", but it is buried in the middle of the first page that the Agreements are optional and the hospital will provide services even if not signed, which is not in upper case letters, bolded or underlined.

14

Further, it only references the waiver of trial by judge or jury in the middle of the first page (again not in upper case letters, bolded or underlined) and then again on the third page of the four (4) page Agreement, which is in capital letters but not bolded or underlined to make it conspicuous.

This Court does not believe that Mrs. Davis or Plaintiff knowingly and intelligently waived the right to a trial by jury. This is a violation of public policy and therefore the Agreements are not only substantively unconscionable, but also unreasonably favor the Defendants.

For all of the foregoing reasons, Defendants' Preliminary Objections were properly overruled and should not be disturbed on appeal.

BY THE COURT:

_____
CHARLES B. BURR, II          S.J.

15