J-A04041-19

2019 PA Super 122

| | | |
|---|---|---|
| CHALENA MCILWAIN, AS ADMINISTRATRIX OF THE ESTATE OF NORMAN JAMES FRANKS | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | : : : : | |
| v. | : : | |
| | : | No. 2060 EDA 2018 |
| | : | |
| SABER HEALTHCARE GROUP, INC., LLC; SABER MANAGEMENT INC.; HEALTHCARE HOLDINGS, LLC; AMBLER HEALTHCARE GROUP, LLC; KAREN PULINI (AS TO AMBLER EXTENDED CARE CENTER) | : : : : : : | |

Appeal from the Order Entered March 6, 2018
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2017-19910

BEFORE:   LAZARUS, J., KUNSELMAN, J., and COLINS*, J.

OPINION BY COLINS, J.:                    **FILED APRIL 22, 2019**

Appellant, Chalena McIlwain (McIlwain), as Administratrix of the estate of Norman James Franks (Franks), appeals from the order entered on March 6, 2018, sustaining the preliminary objections of Appellees, Saber Healthcare Group, Inc., LLC, Saber Management Inc., Healthcare Holdings, LLC, Ambler Healthcare Group, LLC, and Karen Pulini (collectively, Saber) as to survival claims brought by McIlwain concerning the death of Franks, her father.  We reverse the trial court's sustaining of Saber's preliminary objections and remand for further proceedings in the trial court.

Franks suffered from a diagnosis of schizophrenia and dementia.  The Superior Court of California granted McIlwain letters of temporary

_____
*   Retired Senior Judge assigned to the Superior Court.

conservatorship of Franks' person and estate on May 9, 2013. The temporary conservatorship was set to expire on July 31, 2013. On May 13, 2013, Franks entered Saber nursing home in Pennsylvania. McIlwain signed Franks' admission papers in the space designated "Authorized Representative," and the box next to "Conservator" was checked. *See* Saber Sur-Sur Reply, Ex. E. There is an asterisk next to "Conservator," leading to a statement "copy of legal documents must be provided to Facility." *Id.* The document was also signed by a "Facility Representative." *Id.* Additionally, McIlwain signed a "Resident and Facility Arbitration Agreement," which provided, in part, that the parties to the agreement would submit to arbitration if there was a dispute. Prelim. Objs. Ex. B. McIlwain signed the arbitration agreement in the same way she signed the admission paperwork. *Id.* The arbitration agreement stated, in capital letters and bold typeface "Not a Condition Of Admission" at the top of the document. *Id.* Due to Franks' severe cognitive defects, he was incapable of making decisions on his own. *See* Saber Sur-Sur-Reply Brief and Answer at 3; *see also* Saber Sur-Sur-Reply, Ex. G (noting Franks' admission diagnosis of paranoid schizophrenia and advanced vascular dementia).

On July 30, 2013, the Court of Common Pleas of Montgomery County, Orphans' Court Division, appointed McIlwain as permanent guardian for Franks. On July 31, 2013, the letters of temporary conservatorship from the Superior Court of California expired. Franks was a resident at Saber from May 13, 2013 until September 18, 2016. During his stay at Saber, Franks suffered

multiple falls and urinary tract infections.  Franks died on October 24, 2016 after falling and hitting his head while living at Saber.

On August 7, 2017, McIlwain filed a complaint against Saber alleging negligence, wrongful death and survival claims.  Saber filed preliminary objections arguing that the dispute was subject to binding arbitration and attached the arbitration agreement McIlwain signed on behalf of Franks. McIlwain filed a response alleging that Saber did not produce any evidence that McIlwain had the authority to sign that agreement.  Saber filed a sur-reply attaching a copy of the letters of temporary conservatorship from the Superior Court of California.  McIlwain filed a sur-reply arguing that there is no evidence the conservatorship was transferred to Pennsylvania pursuant to the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (UAGPPJA)[1] and therefore, the conservatorship was not valid in Pennsylvania. Saber filed a sur-sur-reply alleging that the conservatorship was valid, in part because of the Full Faith and Credit clause of the United States Constitution.[2]

On March 6, 2018, the trial court filed the order in question, sustaining Saber's preliminary objections as to the survival claims.  The trial court found that McIlwain had the authority to bind Franks to the arbitration agreement, and, therefore, bifurcated the survival claims and sent them to arbitration. The trial court overruled Saber's remaining preliminary objections pertaining

---

[1] 20 Pa.C.S. §§ 5901-5992.

[2] U.S. Const. Art. IV, § 1.

to the wrongful death and negligence claims. As to the wrongful death claims, the trial court determined that McIlwain did not agree to arbitrate her own claims against Saber. **See** TCO at 9-10. The arbitration agreement covered claims "between the parties" and McIlwain was not a party to the agreement. **Id**.

McIlwain filed a motion with the trial court to amend the March 6, 2018 interlocutory order to include the language set forth in 42 Pa.C.S. § 702(b) to allow for an immediate appeal. The trial court did not enter a ruling on the motion, and the motion was deemed denied on May 5, 2018. **See** Pa.R.A.P. 1311(b). In response, McIlwain filed a petition for review with this Court on June 1, 2018.[3] On July 23, 2018, this Court granted the petition for review. The Order directed that the matter should proceed before the Superior Court as an appeal, at 2060 EDA 2018, from the trial court's order dated March 6, 2018.[4]

On appeal, McIlwain raises the following question for review:

1. Did the trial court err in finding that Chalena McIlwain had sufficient legal authority in Pennsylvania to enter into an arbitration agreement on behalf of her father, Norman James Franks?

Appellant's Brief at 3-4.

---

[3] McIlwain filed another petition for review on June 6, 2018, given the docket number 75 EDM 2018. This petition appears to be duplicative of McIlwain's earlier petition and it was, therefore, denied on July 19, 2018.

[4] We note that our Order states "March 8, 2018" but that is a typographical error.

Our review of a challenge to a trial court's decision to grant preliminary objections is guided by the following standard: "[w]e will reverse a trial court's decision to sustain preliminary objections only if the trial court has committed an error of law or an abuse of discretion." **American Express Bank, FSB v. Martin**, 200 A.3d 87, 93 (Pa. Super. 2018). "When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom." **Feingold v. Hendrzak**, 15 A.3d 937, 941 (Pa. Super. 2011) (citation omitted).

At the outset, Saber contends that because McIlwain was appointed temporary conservator of Franks' person and estate in California a few days before signing the arbitration agreement, she had the authority to sign this agreement in Pennsylvania on behalf of Franks. The California letters of temporary conservatorship provided the following:

> The Temporary Conservator has been granted the following powers under Probate Code Sections 2590, which powers are necessary for the protection of the Conservatee and his estate: The power to contract for the guardianship or conservatorship and to perform outstanding contracts and thereby bind the estate…the power to…arbitrate, or otherwise adjust claims, debts, or demands upon the guardianship or conservatorship.

**See** Saber Sur-Reply, Ex. E. We look to the statutes governing guardianships and conservatorships to determine if the California temporary conservatorship gave McIlwain the authority to sign the arbitration agreement in Pennsylvania.

In 2007, the National Conference of Commissioners on Uniform State Laws drafted the Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (Uniform Act) to specifically address jurisdiction and related issues in adult guardianship and protective proceedings, including problems relating to transferring a guardianship from one state to another and recognition of an out-of-state guardianship/conservatorship order. *See* Uniform Adult Guardianship and Protective Proceedings Jurisdiction Act (2007) at 1-2.[5]  In the prefatory note, the Uniform Act states,

> [b]ecause the United States has 50 plus guardianship systems, problems of determining jurisdiction are frequent. . . . There is a need for an effective mechanism for resolving multi-jurisdictional disputes.  Article 2 of the [Uniform Act] is intended to provide such a mechanism. . . . [F]ew states have streamlined procedures for transferring a proceeding to another state or for accepting such a transfer. . . . Article 3 of the [Uniform Act] is designed to provide an expedited process for making such transfers, thereby avoiding the need to relitigate incapacity and whether the guardian or conservator appointed in the first state was an appropriate selection. . . . Sometimes, guardianship or protective proceedings must be initiated in a second state because of the refusal of financial institutions, care facilities, and courts to recognize a guardianship or protective order issued in another state.  Article 4 of the [Uniform Act] creates a registration procedure.  Following registration of the guardianship or protective order in the second state, the guardian may exercise in the second state all powers authorized in the original state's order of appointment . . . .

---

[5]https://www.uniformlaws.org/HigherLogic/System/DownloadDocumentFile.ashx?DocumentFileKey=dc4d38fd-7d13-4d14-053c-7160a2c1a9c3&forceDialog=0 (last visited March 29, 2019).

*Id.* As of March 2019, 49 of the US states and territories have enacted a version of the Uniform Act, including both Pennsylvania and California.[6]

Pennsylvania enacted its version in 2012 known as the UAGPPJA. 20 Pa.C.S. § 5901. "The Act applies only to court jurisdiction and related topics for adults for whom the appointment of a guardian or conservator or other protective order is being sought or has been issued."[7] *Id.* California enacted its version of the Uniform Act, the California Conservatorship Jurisdiction Act (California Act), in 2016. Ca. Probate Code §§ 1980-2033. Likewise, the California Act "applies only to court jurisdiction and related topics for adults for whom the appointment of a [conservator] is being sought or has been issued."[8] Ca. Probate Code § 1980.

The UAGPPJA provides two ways that an out-of-state guardianship/conservatorship can be recognized in Pennsylvania. Section 5922 provides for a transfer of the jurisdiction of the guardianship from

---

[6]https://my.uniformlaws.org/committees/community-home?CommunityKey=0f25ccb8-43ce-4df5-a856-e6585698197 (last visited March 18, 2019).

[7] Conservator is defined in the UAGPPJA as a "person appointed by the court to administer the **property** of an adult." A guardian is defined as "a person appointed by the court to make decisions regarding the **person** of an adult." 20 Pa.C.S. § 5902 (emphasis added).

[8] In California a conservatorship pertains to adults, and guardianships pertain to minors. *See* Ca. Probate Code §§ 1500-1502.

another state into Pennsylvania.[9]  Section 5931 provides for an out-of-state

guardian/conservator to register its guardianship/conservatorship order in

Pennsylvania.[10]  In this case, McIlwain did not follow either procedure.[11]

_____

[9]   "To confirm transfer of a guardianship or conservatorship transferred to this Commonwealth . . . the guardian or conservator must petition the court in this Commonwealth to accept the guardianship or conservatorship. The petition must include a certified copy of the other state's provisional order of transfer."  20 Pa.C.S. § 5922(a).

[10]    If a guardian has been appointed in another state and a petition for the appointment of a guardian is not pending in this Commonwealth, the guardian appointed in the other state, after giving notice to the appointing court of an intent to register, may register the guardianship order in this Commonwealth by filing as a foreign judgment in a court, in any appropriate judicial district of this Commonwealth, certified copies of the order and letters of office. . . . Upon registration of a guardianship or protective order from another state, the guardian or conservator may exercise in this Commonwealth all powers authorized in the order of appointment except as prohibited under the laws of this Commonwealth, including maintaining actions and proceedings in this Commonwealth and, if the guardian or conservator is not a resident of this Commonwealth, subject to any conditions imposed upon nonresident parties.

20 Pa.C.S. § 5931, 5933(a).

[11]   Registration appears to apply when the subject of a guardianship/conservatorship stays in the home state, but the guardian/conservator needs to act on behalf of the guardianship/conservatorship in another state.  *See* Uniform Act, p.33. Transfer appears to apply in the case where a guardian/conservator wishes to transfer the jurisdiction of the guardianship/conservatorship to a different state.  *See* Uniform Act, p.28.  Because McIlwain did not attempt to register or transfer the temporary conservatorship prior to her signing of the arbitration agreement, we do not need to resolve the proper mechanism that should have been followed in this case.

While Saber produced a copy of the letters of temporary conservatorship from California, Saber has not alleged, nor is there any basis to conclude based on the proceedings below that McIlwain petitioned the court in California to transfer the conservatorship. In fact, McIlwain states, in her brief, "[d]efendants produced no evidence, nor is Plaintiff aware of the existence of any such evidence, that any petition was filed to accept the California proceedings or that it was properly registered in Pennsylvania pursuant to § 5933." Appellant's brief at 15. The authority of the temporary conservatorship issued in California emanated from the Superior Court of California. As McIlwain did not follow either of the procedures outlined in the UAGPPJA, the temporary conservatorship granted in California did not give McIlwain the authority to sign the arbitration agreement on behalf of Franks. The Full Faith and Credit clause of the United States Constitution is not offended, because the underlying judgment of incapacity is not disturbed upon following the procedures provided in the UAGPPJA. **See** 20 Pa.C.S. § 5922(g); **see also** § 5933(a).

Next, we determine whether, nonetheless, there exists an agency relationship between McIlwain and Franks that would provide an independent authority for McIlwain to have executed the arbitration agreement on behalf of Franks. "It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration, or mutual meeting of the minds." **Walton v. Johnson**, 66 A.3d 782, 786 n.3 (Pa. Super. 2013)

(citation omitted). "As contract interpretation is a question of law, our review of the trial court's decision is *de novo* and our scope is plenary." ***Cardinal v. Kindred Healthcare, Inc***., 155 A.3d 46, 50 (Pa. Super. 2017) (citation omitted).

"Agency is the relationship which results from the consent of one person that another may act on his behalf." ***Lincoln Avenue Industrial Park v. Norley***, 677 A.2d 1219, 1222 (Pa. Super. 1996) (citation omitted). "The creation of an agency relationship requires no special formalities." ***Walton,*** 66 A.3d at 787 (citation omitted). "The existence of an agency relationship is a question of fact." ***Id.*** "The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence." ***Id.***

> An agency relationship may be created by any of the following: (1) express authority, (2) implied authority, (3) apparent authority, and/or (4) authority by estoppel. Express authority exists where the **principal** deliberately and specifically grants authority to the agent as to certain matters. Implied authority exists in situations where the agent's actions are "proper, usual and necessary" to carry out express agency. Apparent authority exists where the **principal**, by word or conduct, causes people with whom the alleged agent deals to believe that the principal has granted the agent authority to act. Authority by estoppel occurs when the **principal** fails to take reasonable steps to disavow the third party of their belief that the purported agent was authorized to act on behalf of the principal.

***Walton***, 66 A.3d at 786 (citations omitted) (emphasis added).

We find no agency relationship existed between Franks and McIlwain giving McIlwain the authority to sign the arbitration agreement on behalf of

Franks. "The basic elements of agency are the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking." **Walton**, 66 A.3d at 787 (citation omitted). It is clear that there was no express, implied, or apparent authority, nor authority by estoppel to establish an agency relationship between McIlwain and Franks in relation to signing the arbitration agreement. Authority for an agency relationship emanates from the words and actions of the principal, here, Franks. Saber has not alleged Franks was present when McIlwain signed the arbitration agreement or gave express consent to McIlwain to sign the agreement on his behalf. In fact, Saber states that due to Franks' severe cognitive defects, he was incapable of making decisions on his own. **See** Saber Sur-Sur-Reply Brief and Answer at 3; **see also** Saber Sur-Sur-Reply, Ex. G (noting Franks' admission diagnosis of paranoid schizophrenia and advanced vascular dementia).

Saber alleges that McIlwain, by her words and conduct, held herself out as Franks' agent and Saber was justified in relying on her words and conduct. Specifically, Saber alleges that because McIlwain signed the admission agreement, consent for physician care, and authorization and acknowledgement of receipt on behalf of Franks, she had apparent authority to sign the arbitration agreement. However, an agent cannot simply, by her own words, invest herself with apparent authority. **Turnway Corp. v. Soffer**,

- 11 -

336 A.2d 871, 876 (Pa. 1975); *see also V-Tech Services, Inc. v. Street*, 72 A.3d 270, 279 (Pa. Super. 2013). Such authority emanates from the action of the principal and not the agent. *Turnway,* 336 A.2d at 876; *V-Tech Services*, 72 A.3d at 279. As it is clear that Saber did not rely on the words or conduct of Franks, no apparent authority exists. Additionally, we do not assume agency by a mere showing that one person does an act for another. *Walton,* 66 A.3d at 787. "Agency cannot be inferred from mere relationships or family ties." *Wisler v. Manor Care of Lancaster PA, LLC,* 124 A.3d 317, 323 (Pa. Super. 2015) (citation omitted).

Saber did not allege it was misled by any words or conduct of Franks. A party who deals with an agent must "take notice of the nature and extent of the authority conferred." *Wisler,* 124 A.3d at 324 (finding that son with valid power of attorney did not have authority to sign arbitration agreement on behalf of resident where nursing home did not ascertain the nature and extent of son's purported authority). "Parties are bound at their own peril to notice limitations upon the grant of authority before them, whether such limitations are prescribed by the grant's own terms or by construction of law." *Id.* "If a person dealing with an agent has notice that the agent's authority is created or described in a writing which is intended for his inspection, he is affected by limitations upon the authority contained in the writing, unless misled by conduct of the principal." *Id.* Saber had the duty to confirm the extent of McIlwain's purported authority to sign the arbitration agreement as

- 12 -

Franks' agent at the time of reliance. Saber neglected to do so at its own peril.

"The FAA . . . does not require parties to arbitrate when they have not agreed to do so." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 293 (2002) (citation omitted). "Despite national and state policies favoring arbitration, a party cannot be compelled to arbitrate in the absence of a valid agreement to do so under either Pennsylvania law or the [FAA]." *Washburn v. Northern Health Facilities, Inc.*, 121 A.3d 1008, 1015-6 (Pa. Super. 2015) (citation omitted). "The [FAA] requires courts to place arbitration agreements on equal footing with all other contracts." *Kindred Nursing Centers Limited Partnership v. Clark*, 137 S. Ct. 1421, 1424 (2017) (citation omitted). "[T]he existence of an arbitration provision and a liberal policy favoring arbitration does not require the rubber stamping of all disputes as subject to arbitration." *Pisano v. Extendicare Homes, Inc.*, 77 A.3d 651, 661 (Pa. Super. 2013) (citation omitted). "This is especially true where holding otherwise would operate against principles of Pennsylvania contract law and the FAA." *Id.*

We find that the trial court erred as a matter of law in determining that McIlwain had the authority to sign the arbitration agreement on behalf of Franks. Absent an agency relationship, we hold that McIlwain did not have authority to sign the arbitration agreement on behalf of Franks. We reverse the trial court's order bifurcating the survival claims, and remand for further

- 13 -

proceedings consistent with this opinion. The survival claims are to proceed in the trial court concurrent with the wrongful death and negligence claims.

Order reversed. Case remanded.

Jurisdiction Relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 4/22/19