J-S55004-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DEBORAH A. LOMAX, ADMINISTRATRIX FOR THE ESTATE OF RUFUS LOMAX, DECEASED, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| CARE ONE, LLC; 4114 SCHAPER AVENUE OPERATING COMPANY, LLC. D/B/A PRESQUE ISLE REHABILITATION AND NURSING CENTER; CARE ONE MANAGEMENT, LLC; HEALTHBRIDGE MANAGEMENT, LLC; DES HOLDING CO., INC.; THCI HOLDING COMPANY, LLC; THCI COMPANY, LLC; CARE VENTURES, INC.; CARE REALITY, LLC; SHOLIN J. MONTGOMERY, NHA | : | |
| Appellants | : | No. 344 WDA 2020 |

Appeal from the Order Entered February 10, 2020
In the Court of Common Pleas of Erie County
Civil Division at No(s):  No. 10167-2017

BEFORE:   BOWES, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                    **FILED: MARCH 5, 2021**

Care One, LLC, 4114 Schaper Avenue Operating Company, LLC. d/b/a

Presque Isle Rehabilitation and Nursing Center, Care One Management, LLC,

Healthbridge Management, LLC, Des Holding Co., Inc., THCI Holding

Company, LLC, THCI Company, LLC, Care Ventures, Inc., Care Reality, LLC,

---

[*] Retired Senior Judge assigned to the Superior Court.

and Sholin J. Montgomery, NHA (collectively "the Facility") appeal from the order that overruled their preliminary objections to compel arbitration. We affirm.

The following facts are pertinent to our review. Rufus Lomax ("Decedent") had both of his legs amputated below the knee. Decedent's vision was also impaired by cataracts, but he did not desire to undergo yet another surgery. For approximately ten years, he resided in an apartment at an assisted living facility designed for wheelchair-bound tenants. His niece, Deborah A. Lomax ("Ms. Lomax"), provided additional care through preparing meals, running errands, and attending medical appointments with him, eventually becoming employed as his caregiver through a senior program offered by the local community action agency.

Decedent was hospitalized in March 2015 due to complications from an infection. Having also experienced a recent decline in his strength that caused him to fall and develop sores, he decided to cease living on his own and enter a rehabilitation facility upon discharge from the hospital. He opted for Presque Isle Rehabilitation and Nursing Center since it "was one of the only open facilities for him, due to his insurance." N.T. Evidentiary Hearing, 7/30/19, at 95.

Nurse Darlene Stokes performed an assessment of Decedent upon his admission and noted that Decedent suffered from dementia, depression, and poor vision in both eyes with or without glasses. After Ms. Stokes performed

her assessment, Admissions Coordinator Kara Calandrelli secured Decedent's signature on the paperwork attendant to his admission to the Facility. Ms. Calandrelli followed her usual routine of meeting with the new resident in his room and spending forty-five minutes to an hour going through the twenty-page admission agreement. Her customary procedure was to involve a family member or the Erie Office on Aging in the process if the new resident was incompetent or visually impaired. However, she obtained Decedent's signature on the agreement despite his having been assessed by Ms. Stokes as visually impaired and suffering from dementia without any family present. Page sixteen of the twenty-page admission agreement "between Presque Isle Rehabilitation and Nursing Center ('the Facility') and Rufus Lomax,"[1] contained the following provision:

**ARTICLE XIV**
**DISPUTE RESOLUTION AND ARBITRATION**

ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND BROUGHT BY THE RESIDENT, HIS/HER PERSONAL REPRESENTATIVES, HEIRS, ATTORNEYS, OR THE RESPONSIBLE PARTY SHALL BE SUBMITTED TO BINDING ARBITRATION BY A SINGLE ARBITRATOR SELECTED AND ADMINISTERED PURSUANT TO THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION. A CLAIM SHALL BE WAIVED AND FOREVER BARRED IF, ON THE DATE THE DEMAND FOR ARBITRATION IS RECEIVED, THE CLAIM (IF ASSERTED IN A CIVIL ACTION) WOULD BE BARRED BY THE APPLICABLE STATE OF FEDERAL STATUTE OF LIMITATIONS. ANY CLAIMANT CONTEMPLATED BY THIS PARAGRAPH HEREBY WAIVES ANY AND ALL RIGHTS TO BRING SUCH CLAIM OR CONTROVERSY IN ANY MANNER NOT EXPRESSLY

---

[1] **See** Admission Agreement, 3/27/15, at 1.

>    SET FORTH IN THIS PARAGRAPH INCLUDING, BUT NOT LIMITED
>    TO, THE RIGHT TO A JURY TRIAL.

Admission Agreement, 3/27/15, at 16.[2]  Nowhere in the written agreement does it indicate that the arbitration provision was optional or voluntary, and Ms. Calandrelli did not advise Decedent that he did not have to sign this agreement to receive care at the Facility.  Notably, the arbitration provision of the agreement lacked spaces for checking "yes" or "no" that were used elsewhere in the document to accept or reject other "voluntary" provisions. *See*, *e.g.*, *id*. at 3 (regarding consent to allow the Facility to manage financial affairs); *id*. at 10 (concerning use of name in the Facility directory and photo for promotional purposes).  Rather, there was merely a line where Decedent affixed his initials.

After completing the admission process, Decedent resided at the facility for six months until he was admitted to the hospital with a fever, tachycardia, altered mental status, oxygen saturation of 84%, sepsis, and previously-

---

[2] Additionally, Article XVII of the admission agreement stated: "The Resident parties understand that the Facility may change any or all terms and conditions of the Agreement at any time, by serving appropriate notice to the Resident Parties together with the offer of a revised Agreement or an addendum revising the existing Agreement." Admission Agreement, 3/27/15, at 18.  A resident thereafter was required to execute the new agreement or give written notice to the Facility "of an intention to terminate the Agreement." *Id*.  Termination would trigger provisions regarding transfer or discharge of the patient.  *Id*.  Thus, because the arbitration agreement was a term of the admission agreement, the Facility in effect reserved the right to change any or all of the substance of the arbitration agreement unilaterally.

uncharted pressure ulcers. Decedent did not recover, dying in the hospital on September 26, 2015.

Ms. Lomax was appointed as administratrix of Decedent's estate and initiated this wrongful death and survival action against the Facility. In her complaint, Ms. Lomax stated claims of negligence, negligence *per se*, breach of fiduciary duty, and wrongful death, seeking compensatory and punitive damages. Each of the defendants filed preliminary objections to compel arbitration.[3] Ms. Lomax responded opposing arbitration, the trial court conducted an evidentiary hearing, and the parties submitted proposed

---

[3] As noted earlier, the admission agreement is between Decedent and "Presque Isle Rehabilitation and Nursing Center ('the Facility')." Admission Agreement, 3/27/15, at 1. The arbitration clause does not purport to govern claims against the Facility's employees, agents, contractors, or other affiliates. *Cf. Kohlman v. Grane Healthcare Co.*, 228 A.3d 920, 921 (Pa.Super. 2020) (reviewing arbitration clause that governed disputes between the patient and the facility, "its agents, servants, employees, officers, contractors and affiliates"); *MacPherson v. Magee Mem'l Hosp. for Convalescence*, 128 A.3d 1209, 1217 (Pa.Super. 2015) ("The Parties intend that this Agreement shall inure to the direct benefit of and bind the Center, its parent, affiliates, and subsidiary companies, management companies, executive directors, owners, officers, partners, shareholders, directors, medical directors, employees, successors, assigns, agents, insurers and any entity or person (including health care providers) that provided any services, supplies or equipment related to the Patient's stay at the Center . . . ."). Defendants other than the entity doing business as Presque Isle Rehabilitation and Nursing Center each asserted that Ms. Lomax's claims are governed by the agreement without specifying how it is a party to the agreement or otherwise is entitled to benefit from it. However, given our determination that Decedent did not have a valid agreement to arbitrate with any entity, we need not examine whether each defendant established that it was a party to the contract and thus entitled to enforce it.

findings of fact and conclusions of law. Thereafter, the trial court made findings of fact and conclusions of law, determining both that (1) there was no meeting of the minds between the parties as to the arbitration provision, and (2) the provision was unconscionable. Accordingly, the trial court overruled the Facility's preliminary objections.

The Facility filed a timely notice of appeal,[4] and both the Facility and the trial court complied with Pa.R.A.P. 1925. The Facility states the following questions, which we have reordered for ease of disposition:

> 1. The trial court found that an arbitration clause was unconscionable, because [D]ecedent needed nursing home care when he signed it, and because the clause only required [D]ecedent to arbitrate. But this Court has found that, because public policy favors arbitration, issues like these do not make an arbitration clause unconscionable. Was the trial court's decision a reversible error?

> 2. When [D]ecedent was admitted to a nursing home, he signed an admissions agreement and initialed its arbitration clause. The trial court found that [he] was not bound by that contract, because he had poor eyesight. But under Pennsylvania law, a signed contract is presumed to be binding, and evidence of poor eyesight will not overturn this presumption. Was the trial court's decision a reversible error?

The Facility's brief at 5.

We begin with a review of the pertinent legal principles. In an appeal from an order overruling preliminary objections in the nature of a petition to compel arbitration, this Court's review "is limited to determining whether the

---

[4] We have jurisdiction over this appeal from an interlocutory order pursuant to 42 Pa.C.S.§ 7320(a)(1).

trial court's findings are supported by substantial evidence and whether the trial court abused its discretion in denying the petition." ***Pisano v. Extendicare Homes, Inc.***, 77 A.3d 651, 654 (Pa.Super. 2013) (internal quotation marks omitted). "In doing so, we employ a two-part test to determine whether the trial court should have compelled arbitration. First, we examine whether a valid agreement to arbitrate exists. Second, we must determine whether the dispute is within the scope of the agreement." ***MacPherson v. Magee Mem'l Hosp. for Convalescence***, 128 A.3d 1209, 1219 (Pa.Super. 2015) (*en banc)* (cleaned up). On the issues of contractual interpretation, our review is *de novo* and our scope of review is plenary. ***See Cardinal v. Kindred Healthcare, Inc***., 155 A.3d 46, 50 (Pa.Super. 2017).

Pursuant to the mandates of the Federal Arbitration Act ("FAA"), "courts are obligated to enforce arbitration agreements as they would enforce any other contract," and, in considering whether a claim is subject to arbitration, must exhibit "a healthy regard for the federal policy favoring arbitration[.]" ***Taylor v. Extendicare Health Facilities, Inc.***, 147 A.3d 490, 504, 509 (Pa. 2016) (cleaned up). Nonetheless, "a party cannot be compelled to arbitrate in the absence of a valid agreement to do so[.]" ***McIlwain v. Saber Healthcare Grp., Inc***., 208 A.3d 478, 486 (Pa.Super. 2019) (cleaned up).

The following principles pertain to determining the existence of a valid agreement to arbitrate. "It is black letter law that in order to form an enforceable contract, there must be an offer, acceptance, consideration, or

mutual meeting of the minds." ***Id***. at 485 (internal quotation marks omitted).

"Under Pennsylvania law, it is presumed that an adult is competent to enter into an agreement, and a signed document gives rise to the presumption that it accurately expresses the state of mind of the signing party." ***Cardinal***, ***supra*** at 50. As such, "[c]ontracting parties are normally bound by their agreements, without regard to whether the terms thereof were read and fully understood and irrespective of whether the agreements embodied reasonable or good bargains." ***Nicholas v. Hofmann***, 158 A.3d 675, 693 (Pa.Super. 2017) (internal quotation marks omitted).

Nonetheless, as is the case in any action upon a contract, "defenses such as fraud, duress, or unconscionability" are available to challenge the validity of an arbitration agreement. ***Taylor***, ***supra*** at 509. We have explained that "a determination of unconscionability requires a two-fold determination: 1) that the contractual terms are unreasonably favorable to the drafter, and 2) that there is no meaningful choice on the part of the other party regarding the acceptance of the provisions." ***MacPherson***, ***supra*** at 1221 (cleaned up). "The aspects entailing lack of meaningful choice and unreasonableness have been termed procedural and substantive unconscionability, respectively." ***Salley v. Option One Mortgage Corp.***, 925 A.2d 115, 119 (Pa. 2007). "[P]rocedural and substantive unconscionability are generally assessed according to a sliding-scale approach (for example, where the procedural unconscionability is very high, a lesser

degree of substantive unconscionability may be required).” **Id**. at 125 n.12 (citing **Delta Funding Corp. v. Harris**, 912 A.2d 104, 111 (N.J. 2006)).

While “the determination of whether an agreement is unconscionable is ultimately a question of law, . . . the necessary inquiry is often fact sensitive.” **Id**. at 124. Factual issues pertinent to the Court’s inquiry in cases involving arbitration agreements between nursing homes and patients include: (1) the physical and mental state of the patient; (2) whether the patient was alone at the time of its execution; (3) the nature of the admission agreement and whether the arbitration agreement “was part of, or buried within, a potentially lengthy admissions packet that decedent was required to complete, while in ill health;” (4) whether the patient was sent to the facility directly from the hospital; (5) whether the patient had awareness of and the opportunity to research options to instead enter other facilities; (6) whether the patient “was economically constrained” to enter into an agreement with the facility at issue to provide care; and (7) whether the patient had the means to pay for arbitration. **See Kohlman v. Grane Healthcare Co.**, 228 A.3d 920, 927 (Pa.Super. 2020) (listing non-exhaustive factors).

Concerning the procedural prong of the unconscionability examination, our Supreme Court has observed that “[a]n adhesion contract is a standard-form contract prepared by one party, to be signed by the party in a weaker position, usually a consumer, who adheres to the contract with little choice about the terms.” **Chepkevich v. Hidden Valley Resort, L.P.**, 2 A.3d 1174,

1190 (Pa. 2010) (cleaned up). However, "merely because a contract is one of adhesion does not render it unconscionable and unenforceable as a matter of law." *Salley*, *supra* at 127.

For example, this Court reversed trial court findings of unconscionability of arbitration agreements in both *MacPherson* and *Cardinal*, cases significant to the trial court's ruling and the Facility's arguments in this appeal. *MacPherson* and *Cardinal* each concerned challenges to four-page arbitration agreements between nursing homes and patients that were executed at the time of admission separately from the respective admission agreements. The arbitration agreement at issue in *McPherson* provided as follows:

> ***VOLUNTARY AGREEMENT*: If you do not accept this Agreement, the Patient will still be allowed to live in, and receive services in, this Center.**
>
> ***ARBITRATION AGREEMENT ("AGREEMENT")***
>
> **BY ACCEPTING THIS AGREEMENT, THE PARTIES ARE WAIVING THEIR RIGHT TO A TRIAL BEFORE A JUDGE AND/OR A JURY OF ANY DISPUTE BETWEEN THEM. PLEASE READ THIS AGREEMENT CAREFULLY AND IN ITS ENTIRETY BEFORE ACCEPTING ITS TERMS.**
>
> This Agreement made on _____ (date) by and between the Parties, Patient Richard MacPherson [handwritten] and/or Patient's Legal Representative _____ (collectively referred to as "Patient"), and the Center Manor Care Yeadon [handwritten], is an Agreement intended to require that Disputes be resolved by arbitration. The Patient's Legal Representative agrees that he is signing this Agreement as a Party, both in his representative and individual capacity.

***A. What is Arbitration?***: Arbitration is a cost effective and time saving method of resolving disputes without involving the courts. In using arbitration, the disputes are heard and decided by a private individual called an arbitrator. The dispute will not be heard or decided by a judge or jury.

***B. AGREEMENT TO ARBITRATE "DISPUTES"***: Any and all claims or controversies arising out of or in any way relating to this Agreement, the Admission Agreement or any of the Patient's stays at this Center, or any Center operated by any subsidiary of HCR–Manor Care, Inc., whether or not related to medical malpractice, including but not limited to disputes regarding the making, execution, validity, enforceability, voidability, unconscionability, severability, scope, interpretation, preemption, waiver, or any other defense to enforceability of this Agreement or the Admission Agreement, whether arising out of State or Federal law, whether existing now or arising in the future, whether for statutory, compensatory or punitive damages and whether sounding in breach of contract, tort or breach of statutory duties (including, without limitation except as indicated, any claim based on Patients' Rights or a claim for unpaid Center charges), regardless of the basis for the duty or of the legal theories upon which the claim is asserted, shall be submitted to binding arbitration. Notwithstanding the above, nothing in this Agreement prevents the Patient from filing a grievance or complaint with the Center or appropriate governmental agency; from requesting an inspection of the Center from such agency; or from seeking review under any applicable federal, state or local law of any decision to involuntarily discharge or transfer the Patient from the Center.

> . . . .

***E. RIGHT TO CHANGE YOUR MIND***: This Agreement may be cancelled by written notice sent by certified mail to the Center's Administrator within thirty (30) calendar days of the Patient's date of admission. If alleged acts underlying the dispute occur before the cancellation date, this Agreement shall be binding with respect to those alleged acts. If not cancelled, this Agreement shall be binding on the Patient for this and all of the Patient's other admissions to the Center without any need for further renewal.

***F. OTHER PROVISIONS***:

- 11 -

***1. No Caps/Limits on Damages***: There are no caps/limits on the amount of damages the Panel can award other than those already imposed by law in the state in which this Center is located. All state laws, statutes and regulations that limit awardable damages and define the scope of admissible and inadmissible evidence (i.e. regulatory surveys, incident reports, etc.) expressly apply to any arbitration hearing held pursuant to this Agreement.

***2. Opportunity to Review & Right to Consult with Attorney***: The patient (if competent) and the Patient's Legal Representative acknowledge that the Patient and Legal Representative have each received a copy of this Agreement, and have had an opportunity to read it (or have it read to him/her) and ask questions about it before accepting it. Please read this Agreement very carefully and ask any questions that you have before signing it. Feel free to consult with an attorney of your choice before signing this Agreement.

. . . .

***6. Fees and Costs***: The Panels' fees and costs will be paid by the Center except in disputes over non-payment of Center charges wherein such fees and costs will be divided equally between the Parties. NAF's administrative fees shall be divided equally among the Parties. To the extent permitted by law, any Party who unsuccessfully challenges the enforcement of this Agreement shall be required to pay the successful Parties' reasonable attorney fees and costs incurred to enforce such contract (i.e., Motion to Compel Arbitration). The Parties shall bear their own attorney fees and costs in relation to all preparation and attendance at the arbitration hearing, unless the Panel concludes that the law provides otherwise. Except as stated above, the Parties waive any right to recover attorneys' fees and costs.

. . . .

**BY SIGNING BELOW, THE PARTIES CONFIRM THAT EACH OF THEM HAS READ ALL FOUR (4) PAGES OF THIS AGREEMENT AND UNDERSTANDS THAT EACH HAS WAIVED THE RIGHT TO A TRIAL BEFORE A JUDGE OR JURY AND THAT EACH OF THEM CONSENTS TO ALL OF THE TERMS OF THIS VOLUNTARY AGREEMENT.**

***MacPherson***, ***supra*** at 1213–18 (emphases in original).

Although the trial court found the agreement to arbitrate in *MacPherson* invalid, this Court reversed, concluding that it was neither procedurally nor substantively unconscionable. We observed the following. At the outset, in prominent styling, the agreement indicated that it was voluntary and made it clear that "the Patient will still be allowed to live in, and receive services at Manor Care*."* *Id*. at 1222 (internal quotation marks omitted). Further, the patient was conspicuously notified that he had thirty days to change his mind. Hence, we concluded that there was no lack of meaningful choice on the part of the patient.

Regarding substantive unconscionability, we noted that the requirement that each side pay its own fees and costs in preparation of arbitration, which was a significant basis for the trial court's conclusion that the agreement unreasonably favored Manor Care, was the same as would be the case in common pleas court. *Id*. at 1221. Manor Care agreed to pay the arbitration panel's costs and fees, and placed no limits on the type or amount of available damages. Additionally, the agreement contained a large, bold indication that both Manor Care and the patient were waiving their rights to a jury trial. *Id*. Thus, we concluded that the terms of the agreement did not unreasonably favor Manor Care. Accordingly, we reversed the trial court's order overruling the preliminary objections.

In *Cardinal*, this Court likened the agreement at issue to that in *MacPherson*. We indicated that it contained "a capitalized, bold-faced

notification at the very top of the agreement stating: '**THIS AGREEMENT IS NOT A CONDITION OF ADMISSION TO OR CONTINUED RESIDENCE IN THE FACILITY**.'" **Cardinal**, **supra** at 53 (emphasis in original). The first page of the agreement additionally provided:

> **THE PARTIES UNDERSTAND, ACKNOWLEDGE, AND AGREE THAT BY ENTERING INTO THIS AGREEMENT THEY ARE GIVING UP THEIR CONSTITUTIONAL RIGHT TO HAVE THEIR DISPUTES DECIDED BY A COURT OF LAW OR TO APPEAL ANY DECISION OR AWARD OF DAMAGES RESULTING FROM THE ADR PROCESS EXCEPT AS PROVIDED HEREIN.**

**Id**. at 53-54 (emphasis in original). Moreover, as in **MacPherson**, "[t]he agreement state[d] that the parties will each bear their own fees and costs, that [the facility] shall pay the arbitrators fees and costs, and that the monetary relief available via arbitration is the same as that which would be available in a court of law". **Id**. at 54. Finally, the agreement also specified that the patient had thirty days to revoke the agreement. **Id**. Thus, we concluded that the agreement was not unconscionable and the trial court erred in overruling the facility's preliminary objections.

Turning to the case *sub judice*, the Facility maintains that the trial court erroneously found the arbitration agreement procedurally unconscionable "simply because it considered the Admission Agreement to be a contract of adhesion that [Decedent] had to sign if he wanted to remain at the facility." The Facility's brief at 46. It argues that the facts of this case are "very similar" to those in **Cardinal** since Ms. Calandrelli testified that Decedent would not

be discharged if he had failed to sign the arbitration agreement. *Id*. at 47-48. The Facility asserts that there was no evidence that Decedent felt time-pressured to sign the arbitration agreement or that he was unable to understand what he was doing. *Id*. at 51-52.

The Facility further contends that the arbitration agreement was not substantively unconscionable, as our Supreme Court has expressly held that non-reciprocal arbitration agreements are not *ipso facto* unconscionable. *Id*. at 56 (citing *Salley*, *supra* at 117-18, 129). It maintains that "[a] non-reciprocal arbitration agreement makes sense in this situation" because a collection action, the type of claim most likely to have been brought by the Facility against Decedent, "is more efficient to pursue" in a court. *Id*. at 57.

Finally, the Facility asserts that the trial court misread the *Cardinal* decision, improperly concluding that the specific contract terms noted favorably in *Cardinal* and *MacPherson* evidencing a lack of unconscionability were now required elements for any arbitration agreement to be valid under Pennsylvania law. *Id*. at 60. It argues that by holding that the arbitration agreement had "to be identical to the contract discussed in *Cardinal* to be enforceable," the trial court "turned the burden of proving unconscionability on its head" and runs afoul of the FAA's prohibition against discrimination against arbitration provisions. *Id*. at 61. Nonetheless, the Facility posits, its arbitration agreement passes the trial court's *Cardinal*-based litmus test. *Id*. at 62-67.

We disagree with the Facility's characterization of the trial court's determination. The trial court offered the following explanation of its finding that the Facility's arbitration provision[5] was both procedurally and substantively unconscionable:

> Taken as a whole, this Arbitration Clause in the instant case was meant to be a part of the Admissions Agreement, without the ability for Decedent to rescind this clause. Decedent was not provided any notice that his acquiescence to this Arbitration Clause was not required to obtain treatment in the facility. This Arbitration Clause was only explained to a resident if the resident specifically asked questions about the Arbitration Clause and even then Ms. Calandrelli did not sufficiently explain the significant impact of this Arbitration Clause on a resident's life. . . . Ms. Calandrelli introduced the Arbitration Clause to residents as follows: "So I would say arbitration is where parties meet and an arbitrator would be there to hear both sides. And then the

_____

[5] To reiterate, the arbitration agreement at issue herein provides, *in toto*, as follows:

> ANY CONTROVERSY OR CLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT AND BROUGHT BY THE RESIDENT, HIS/HER PERSONAL REPRESENTATIVES, HEIRS, ATTORNEYS, OR THE RESPONSIBLE PARTY SHALL BE SUBMITTED TO BINDING ARBITRATION BY A SINGLE ARBITRATOR SELECTED AND ADMINISTERED PURSUANT TO THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION. A CLAIM SHALL BE WAIVED AND FOREVER BARRED IF, ON THE DATE THE DEMAND FOR ARBITRATION IS RECEIVED, THE CLAIM (IF ASSERTED IN A CIVIL ACTION) WOULD BE BARRED BY THE APPLICABLE STATE OF FEDERAL STATUTE OF LIMITATIONS. ANY CLAIMANT CONTEMPLATED BY THIS PARAGRAPH HEREBY WAIVES ANY AND ALL RIGHTS TO BRING SUCH CLAIM OR CONTROVERSY IN ANY MANNER NOT EXPRESSLY SET FORTH IN THIS PARAGRAPH INCLUDING, BUT NOT LIMITED TO, THE RIGHT TO A JURY TRIAL.

Admission Agreement, 3/27/15, at 16.

arbitrator would make the decision, just like a judge. And it's binding and it's a legal – like whatever the outcome is, it's a legal finding, so." . . .

> After review of the entire Admission Agreement, this agreement did not require Decedent to initial after every clause, but rather, just a few select clauses chosen by the drafters of the Admissions Agreement such as the Arbitration Clause. Residents were not made aware they were not required to sign said Admission Agreement and still could receive medical care and treatment; residents were not aware they were not required to consent to the Arbitration Clause; and residents were not permitted to rescind their consent to the Arbitration Clause within thirty (30) days. By initialing this Arbitration Clause, residents were forever relinquishing their fundamental rights to a trial by jury and to pursue an action in a court of law. This Arbitration Clause is also not reciprocal in that Presque Isle Rehabilitation and Nursing Center still retained its right to a trial by jury and its right to pursue a legal action in a court of law. A review of this Arbitration Clause in the Admissions Agreement demonstrates all terms described in **Cardinal** are not present.

Trial Court Opinion, 2/10/20, at 21-23.

The trial court further addressed the procedural prong of the unconscionability inquiry as follows:

> Decedent was unable to negotiate or counter the terms of the Arbitration Clause. Decedent also knew he needed a significant amount of assistance daily such as help with transferring from his bed, using the toilet, dressing himself, daily hygienic needs, and bathing. Decedent was never informed he would be allowed to remain in the facility if he chose not to agree to the Arbitration Clause. Decedent had no realistic choice as to the terms of the Arbitration Clause. Decedent knew he needed medical care and treatment, and if he did not sign the Admissions Agreement he would not receive said medical care and treatment he needed.

Trial Court Opinion, 2/10/20, at 24.

The Facility seeks to have us overturn the trial court's finding by attacking particular facts piecemeal and contrasting in isolation statements

- 17 -

from other cases. Properly viewing the attendant circumstances of this case as a whole and applying the sliding-scale analysis approved by our Supreme Court in **Salley**, **supra** at 125 n.12, 128, we find no basis to conclude that the trial court erred or abused its discretion by finding that there was no valid agreement to arbitrate based upon the unconscionability of the arbitration provision proffered by Defendants.

We begin by noting that almost all of the factors this Court identified in **Kohlman** as relevant to procedural unconscionability support the trial court's finding. **See Kohlman**, **supra** at 927. The testimony credited by the trial court at the evidentiary hearing establishes that Decedent was elderly, depressed, and had documented dementia; he arrived at the Facility directly from the hospital, alone, and burdened by recently accepting that he was not able to care for himself any longer; the arbitration provision was buried deep within a lengthy admission agreement that took forty-five minutes to an hour to complete; the Facility was one of few that had an opening and accepted his insurance, thus rendering him economically constrained to agree to the Facility's terms, which were non-negotiable and not presented with an option to decline or to revoke agreement upon further reflection.[6] **See** N.T.

---

[6] The Facility contends that the trial court's finding that Decedent knew that he needed medical care and would not receive it if he did not sign the Admission Agreement, thereby agreeing to the arbitration provision, was "contradicted by Ms. Calandrelli's testimony that [Decedent] would not have been discharged if he failed to sign the Admission Agreement." The Facility's

Evidentiary Hearing, 7/30/19, at 45-47 (describing Decedent's condition on admission); *id*. at 79-80, 95 (concerning Decedent's need for professional assistance and lack of options); *id*. at 121 (Ms. Calandrelli testifying that she did not tell residents that the arbitration agreement was mandatory or voluntary). **See also** Admission Agreement, 3/27/15, at 16 (containing no statement that the agreement to arbitrate is voluntary).

As to its substance, the provision purported to require binding arbitration only of claims brought by Decedent without reciprocally requiring the Facility to waive its jury trial rights in any claims it might have under the agreement. Moreover, Article XVII of the admission agreement, under miscellaneous provisions, specified that the Facility retained the right to "change any or all terms and conditions of the Agreement at any time," that a resident's failure to execute a modified agreement would constitute a material breach of the Agreement, and that such would terminate the Agreement and subject the resident to transfer or discharge.[7] **See** Admission Agreement, 3/27/15, at 18.

---

brief at 48. The Facility neglects to acknowledge that Ms. Calandrelli conceded that she never shared the information that the agreement was voluntary with Decedent or any other new patient. **See** N.T. Evidentiary Hearing, 7/30/19, at 121-22.

[7] Although the trial court did not rely upon Article XVII of the admission agreement, which by its terms is applicable to the arbitration provision, in its finding of substantive unconscionability, we reiterate that the ultimate question is one of law, to which we apply a *de novo*, plenary review. **See**

In our view, the trial court's contrast of the sparse, one-sided arbitration provision included in Decedent's agreement that was never disclosed to Decedent as voluntary with the detailed, stand-alone, voluntary arbitration agreements at issue in **Cardinal** and **MacPherson** did not amount to an improper litmus test. Rather, it served to highlight why the trial court's unconscionability finding in this case should not be overturned as were the findings in those cases.

In sum, the Facility offered a classic contract of adhesion to a vulnerable man in need of medical assistance, not as a voluntary agreement but as a requirement for his admission. The arbitration agreement unreasonably favored the Facility, not requiring it to waive any litigation rights and allowing it to unilaterally change the terms and evict Decedent if he did not accept the modification. The trial court did not err, abuse its discretion, or violate the FAA in concluding that the arbitration agreement herein was invalid based upon the generally applicable contract defense of unconscionability. As there was no valid agreement to arbitrate, the trial court properly overruled Defendants' preliminary objections.[8]

---

**Cardinal v. Kindred Healthcare, Inc.**, 155 A.3d 46, 50 (Pa.Super. 2017). As such, we are not bound by the trial court's rationale.

[8] Given our conclusion that the trial court did not err or abuse its discretion of finding that there was no valid agreement to arbitrate based upon the unconscionability of the arbitration provision proffered by the Facility, we need not consider the propriety of the trial court's determination that there was no meeting of the minds due to Decedent's poor vision.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/5/2021